STATE OF NORTH CAROLINA v. TIMOTHY ROGERS CHAMBERLAIN

No. 135A81

(Filed 7 December 1982)

1. **Criminal Law § 120.1— capital case—eligibility for parole or probability of execution—necessity for instruction—question not presented**

It was not necessary for the Supreme Court to decide whether, under the circumstances of this case, the trial court should have instructed the jury during the selection process that defendant's eligibility for parole if he were sentenced to life imprisonment and the probability that defendant would in fact be executed if he were sentenced to death were not proper matters for their consideration where the jury returned a verdict of guilty of second degree murder and thus did not have occasion to consider whether to recommend a sentence of death or life imprisonment.

2. **Criminal Law § 76.5— admissibility of confession—finding not required by evidence**

The trial court was not required to find that an officer told defendant that if he made a statement "it would be easier for everyone" because the officer stated on cross-examination, after repeated questioning on this point and after repeated assertions that he recalled making no such statement, that "[i]f he [defendant] said that I did make such a statement I don't know how I could deny it because I don't remember saying it," where the clear thrust of the officer's testimony was that he did not make such a statement to the defendant.

3. **Criminal Law § 75.3— confronting defendant with identification by victim—confession not involuntary**

An officer's statement to defendant that the deceased had identified defendant as the person who had hit him in the head with a brick did not render defendant's subsequent confession involuntary where the evidence showed that the statement was truthful in that deceased nodded his head affirmatively when asked by the officer if defendant was the person who had hit him and that deceased squeezed the officer's hand when asked to do so if defendant was the person who had hit him.

4. **Criminal Law § 75.2— officer's statement as to defendant's lack of intent to kill—confession not involuntary**

Even if an officer told defendant that he knew defendant killed the deceased but that defendant may not have intended to do so, the connection between the officer's statement and defendant's subsequent confession was so attenuated that the statement itself could not render the confession involuntary where it was unaccompanied by any express promise or suggestion of leniency, was made the day before defendant actually confessed, and was followed by defendant's twice asserting his rights to remain silent and to counsel.

State v. Chamberlain

**5. Criminal Law § 99.2— remark by trial judge—no prejudice to defendant**

Defendant was not prejudiced by the trial judge's remark during an officer's testimony at a voir dire hearing on the admissibility of defendant's confession that he was "not going to pay attention to anything he said," whether such remark referred to what the defendant might say or to what was said to defendant by the officer, where the record shows that it did not intimidate, stifle or constrain defendant in the introduction of his evidence either on voir dire or before the jury.

**6. Homicide § 26— instruction on felony murder in the second degree—error not prejudicial**

Although the trial court's instruction that the jury could find defendant guilty of second degree murder on a felony murder theory was erroneous since this jurisdiction recognizes no offense of felony murder in the second degree, such error was not prejudicial where the court also instructed the jury that it could find defendant guilty of second degree murder "on the basis of malice without premeditation and deliberation," the jury returned a verdict of guilty of second degree murder both "on the basis of malice without premeditation and deliberation" and "under the second degree felony rule," and the evidence at trial supported a second degree murder conviction on the theory of malice.

**7. Homicide § 24.1— intentional use of deadly weapon—instructions on presumption of malice and unlawfulness**

The trial court did not err in instructing the jury that if the State proved beyond a reasonable doubt that defendant intentionally killed the victim with a deadly weapon or intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused his death, the law implies that the killing was unlawful and done with malice.

**8. Homicide § 30.2— failure to submit voluntary manslaughter as alternative verdict**

The trial court in a homicide prosecution did not err in refusing to submit voluntary manslaughter as an alternative verdict where the evidence tended to show that defendant intentionally killed the victim by striking him with a brick, a deadly weapon, and there was no evidence of any killing in the heat of passion or in self-defense.

Justices COPELAND and MARTIN did not participate in the consideration or decision of this case.

BEFORE *Judge Napoleon B. Barefoot,* presiding at the 20 July 1981 Criminal Session of LENOIR Superior Court, and a jury, defendant was found guilty of second degree murder. He was sentenced to life imprisonment and appeals of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Guy A. Hamlin, Assistant Attorney General, for the State.*

*William D. Spence for defendant appellant.*

EXUM, Justice.

In this appeal defendant's assignments of error relate to the trial court's failure to grant his motion to suppress his pretrial confession, the denial of his motions to dismiss the charge, and the court's instructions to the jury. We find no reversible error in the trial; therefore, we affirm the judgment.

The state's evidence tends to show the following:

On 24 February 1981, the victim, Wilbert Grady, was eighty-three years old and lived in a house with his son, Isom Grady, near LaGrange, North Carolina. When Isom went to work around 7:30 that morning, he left his father sitting near a heater. When Isom returned from work around 4:45 p.m., he found his father sitting on the floor in the sitting room, leaning against a wall near the heater. Although the victim was alive when Isom found him, he was unable to speak; he had a gash about an inch long on his forehead and blood on his T-shirt. A fire brick, not there when he went to work, was lying near his father when Isom returned. Isom observed that the house had been ransacked and that a door leading to the outside was badly damaged. Isom testified that his father kept a considerable sum of money on his person and on the day in question had at least $1,200 or $1,500 in a billfold in his pocket.

Isom rushed to LaGrange and reported what he had found to police. An ambulance was dispatched to the Grady residence and his father was taken to the hospital in Kinston. X-rays disclosed a fractured skull and "intercranial bleeding," a wound which the emergency room physician recognized as being "almost always fatal." He was taken to Craven County Hospital in New Bern where he was treated for head and brain injuries; he died as a result of those injuries on 2 March 1981. The pathologist who performed an autopsy on the victim found that his brain was bruised and testified that the brain injury he observed was "consistent with having been produced" by a blow with a brick, and "that the most probable cause of . . . death was this traumatic injury . . . to his head."

Following the death of Wilbert Grady, a warrant was issued for defendant's arrest. On 9 March 1981 police officers went to a house near Freemont for the purpose of serving the warrant.

After being admitted to the house and finding defendant hiding in the corner of a clothes closet, they arrested him.

On 10 March 1981, while defendant was in custody, he signed a written statement relating to the charged offense. In the statement defendant admitted going to Wilbert Grady's house at 1:45 p.m. on 24 February 1981. After he knocked on the door and received no answer, he took a brick off a shelf on the porch and broke in the door. Wilbert Grady was sitting in a chair "just about to go to sleep." Defendant hit Grady in the head with the brick. He then "went through" everything in the front room, took a purse from Grady's front pants pocket and left. After leaving the house, he took approximately $1,000 contained in the purse and threw the purse into a field. Defendant went to a house in the area and got Robert Dawson to take him to LaGrange where he purchased about $150 worth of groceries and some marijuana. He gave most of the money away.

Defendant's only evidence was his own testimony, which is summarized as follows:

At the time of trial defendant was eighteen years of age and had completed the seventh grade. Wilbert Grady was his great-uncle. On 24 February 1981, defendant was not working and went to Grady's house to borrow money from him. As he was walking the two and one-half miles from LaGrange to Grady's house, he caught a ride with Andre Nevins. On arriving at the Grady house, defendant knocked on the door and Grady admitted defendant and Nevins. Defendant and Nevins entered and defendant told Grady what he wanted; Grady loaned defendant $30. Grady then asked defendant to hang a shotgun, which he had near him, in the front room. Defendant did so. When defendant returned to the room Grady was in, he observed Grady sitting in his chair with blood coming from his head. Nevins was holding Grady's purse and counting the money that was in it. Defendant "cussed" at Nevins, snatched the purse out of his hand, threw it on the floor and left the house running. Before leaving the house defendant criticized Nevins for taking the money and told him that he did not want "to have nothing to do with it." Defendant went to Pauline Morgan's house where he prevailed on Robert Dawson to take him to LaGrange. In LaGrange he went to a residence and purchased some marijuana. Thereafter, as he was walking to

another part of town, he saw Nevins in his car. He entered the Nevins car and remained there for about ten minutes. While in the car on that occasion, Nevins gave him $300. He then left Nevins and did not see him again. Defendant did not at any time strike Grady, rob him or harm him in any way.

Andre Nevins was not called as a witness by either the state or the defendant.

The court submitted to the jury alternative verdicts of: (1) first degree murder on alternative theories of premeditation and deliberation and the felony murder rule; (2) second degree murder on alternative theories of malice and what the trial court referred to as "a second degree felony rule"; and (3) not guilty. The jury found defendant guilty of second degree murder on the basis of malice and "under the second degree felony rule."

I.

[1]  By his first assignment of error defendant contends the trial court erred in failing to instruct the jury during the jury selection process that defendant's eligibility for parole if he were sentenced to life imprisonment, and the probability that defendant would in fact be executed if he were sentenced to death, were not proper matters for their consideration.

Before trial defendant filed a written motion stating: The state would seek the death penalty in his case; potential jurors would be asked about their attitudes concerning capital punishment during the jury selection; and he anticipated some prospective jurors would express their belief that a death sentence would never be carried out, that a higher court would "set him free," or that if he received a life sentence, he would be released from prison on parole after only a few years. Defendant requested that if any prospective juror so responded, the court then instruct the juror not to speculate upon "these matters," that the jury is duty-bound to follow the law as given to them by the court, and that "death means death and life imprisonment means life imprisonment."

The record discloses that during jury selection, after the state had passed the jury, defendant's attorney questioned prospective jurors in the presence of all potential jurors on whether

they had read or heard anything that would cause them to believe that defendant would not actually be executed even if a death sentence were pronounced, or would not spend his life in prison if he were sentenced to life imprisonment. Five prospective jurors seated in the jury box stated that defendant "would probably be paroled or the case would be appealed or the death sentence would not actually take place."

The court denied defendant's request that these jurors be instructed as requested in defendant's pretrial motion. The record reveals that "[s]ix jurors who were in the jury box at the time of the simultaneous responses ultimately remained on the [jury] which convicted the Defendant."

Defendant relies on *State v. Conner*, 241 N.C. 468, 85 S.E. 2d 584 (1955), and *State v. Flippin*, 280 N.C. 682, 186 S.E. 2d 917 (1972). In *Conner* defendant was tried for first degree murder, and the state sought the death penalty. After the jurors had deliberated for some time, they returned to the courtroom. One juror wanted to know if defendant would be eligible for parole if he were given life imprisonment. The trial judge stated that he could not answer that question and the jury returned to their room. They returned a verdict of guilty without recommendation of life imprisonment. Defendant appealed from the judgment imposing a death sentence. In granting a new trial this Court held that "[w]hen the question of eligibility for parole arises spontaneously during the deliberations of the jury, and is brought to the attention of the court by independent inquiry of the jury and request for information," 241 N.C. at 471, 85 S.E. 2d at 587, the court should give the jurors

a positive instruction to put the irrelevant question, and matters relating thereto, out of their minds; for example, by having the court reporter read to the jury the pertinent part of the original charge bearing on the question of the right of the jury to recommend life imprisonment under application of the 1949 statutory amendment, and by further instruction in substance as follows: that the question of eligibility for parole is not a proper matter for the jury to consider and that it should be eliminated entirely from their consideration and dismissed from their minds; that in considering whether they should recommend life imprisonment, it is their duty to

determine the question as though life imprisonment means exactly what the statute says: 'imprisonment for life in the State's prison,' and that they should resolve the question of mitigation of punishment in the exercise of their unbridled discretion, wholly uninfluenced by considerations of what another arm of the government might do or might not do in the future by way of commutation, pardon, or parole.

241 N.C. at 471-72, 85 S.E. 2d at 587.

In *State v. Flippin, supra,* 280 N.C. 682, 186 S.E. 2d 917, the defendant was charged with rape, and the state was seeking the death penalty. After the jury began their deliberations, they returned to the courtroom in order to ask the court if defendant would be eligible for parole should they reach a verdict of guilty with a recommendation for life imprisonment. The trial judge responded that he could not enlighten the jury on that question, but further instructed them: "This is a matter that you should not be concerned with and are in law not concerned with. . . . [I]f you return a verdict of guilty with a recommendation of life imprisonment the punishment will be life imprisonment and that is as much as I can tell you." *Id.* at 688, 186 S.E. 2d at 921. The jury returned a guilty verdict and recommended life imprisonment. This Court held that the trial judge "properly declined to answer the foreman's question and adequately instructed the jury that the question of eligibility for parole was not a proper matter for their consideration." *Id.* at 689, 186 S.E. 2d at 922.

The instant case is not controlled by the decision in *Conner* and the legal principle restated in *Flippin.* In those cases the jury, after beginning its deliberation, spontaneously raised the questions and requested information. In the case at bar, defendant's counsel raised the questions before the jury was selected, and the record does not establish that the five prospective jurors who expressed concern sat on the jury ultimately selected.

In any event, we need not decide whether under these circumstances the trial court should have instructed in accordance with defendant's motion because the jury did not return a verdict of guilty of first degree murder and did not have occasion to consider whether to recommend a sentence of death or life imprisonment. On the contrary, they returned a verdict of guilty of second degree murder, the sentence for which was not determined by the

jury but by the trial judge in the exercise of his discretion within the range permitted by the then-existing statute.[1] This assignment is overruled.

## II.

Defendant's assignments of error argued under Questions II through IX and XIV as presented in his brief all relate to the voir dire hearing on his motion to suppress his confession.

The principal witnesses at the hearing were Lieutenant Pearson of the Lenoir County Sheriff's Department, who was in charge of the investigation, and defendant himself. Pearson testified on direct examination that after he obtained the murder warrant for defendant's arrest he went with three other deputies, two of whom were from the Wayne County Sheriff's Department, to a house near Freemont. Defendant, found in a closet in the rear bedroom, was arrested. Pearson then rode in the car with defendant and the two other deputies from this house to Kinston. Pearson said that during this trip defendant was advised of his rights to remain silent and to a lawyer. Defendant said that he wanted a lawyer and did not want to make a statement. Defendant also refused to sign a form indicating that he had waived his rights. Pearson then testified as follows:

Q. What happened then?

A. At that point he stated if I was to bring it to him the next day he would sign it, the waiver and he would talk to me.

Q. And that he would what?

A. Talk to me.

Q. In order to get him to say that to you, did you suggest that very point to him?

A. No, sir.

Q. Did you say anything to him to get him to come to see you the next day and to sign the form and to talk to you?

---

1. The controlling statute was G.S. 14-17 (Cum. Supp. 1979) which then provided for a maximum term of life imprisonment and a minimum term of two years. Second degree murder is now punished as a Class C felony. G.S. 14-17 (1981).

A. No, sir. I did not ask him any questions whatsoever after he told me he didn't want to talk with me about the incident. I did not threaten him in any way to get him to execute the *Miranda* Form or to make any statement to me whatsoever at this time. I did not offer any promise or hope of reward or anything of that nature to get him to talk with me and execute the form at that time. I did not use any sort of inducement to get him to do anything on this occasion. I did not use any sort of coercion, duress, fraud, trickery or anything of that nature to get him to execute the form at that time or to say anything to me at all. He appeared to me to know where he was and what was going on around and about him.

Pearson then testified that at 12:05 p.m. the following day he went to the jail to see defendant. He again advised defendant of his rights to remain silent and to a lawyer; defendant, after indicating that he understood his rights, waived them in writing. Pearson testified that when defendant made his confession, "he appeared . . . to understand what I was saying to him and what was going on around and about him. He did not appear . . . to be under the influence of any narcotic drug or alcoholic beverage. . . . I did not threaten him . . . offer him any promise or hope of reward . . . use any sort of inducement . . . use any sort of fraud or trickery . . . [or] use any sort of force or coercion to get him to talk to me." Thereafter defendant confessed to having struck Grady in the head with a brick and to burglarizing Grady's home on the afternoon of 24 February 1981.

On cross-examination Pearson was asked repeatedly whether he made certain statements to the defendant to induce defendant to confess. Pearson testified as follows:

I don't remember any specific conversation that I had with Tim Chamberlain during the hour and a half from the time that we left the house until we got back to Kinston.

Q. Did you tell him if he would go ahead and make a statement it would help him in Court?

A. Not that I recall.

Q. Did anyone tell him that?

A. Not that I recall.

I didn't make any notes on the trip. I do not have anything to refresh my recollection on that point.

Q. At any point from the time you first arrested him in the house until the last time you spoke with him, did anyone tell him that if he made a statement it would help him in Court?

A. Not that I recall.

Q. Did you tell him or did you hear anyone tell him that if he would go ahead and make a statement that you could testify in Court that he had cooperated and it would help him?

A. Not that I recall.

Q. Did you say anything to him then?

A. Not that I recall.

If he said that I did make such a statement I don't know how I could deny it because I don't remember saying it.

I believe I did tell him that I knew that he had killed the old man, Mr. Grady at some point from the time when I first arrested him until the time that I interrogated him the last time. I told him I knew he had killed the old man. I said I don't know anything about an accident. I remember telling the Defendant that I knew he had killed the old man. I don't remember telling the Defendant that it could have been an accident but I could have possibly said that.

Q. I will ask you one more time, Mr. Pearson, for the record, did you at any point during your interrogation of the Defendant in the car tell him that you knew that he had killed Mr. Grady but that you didn't think he meant to do it?

A. I told Mr. Chamberlain I knew that he had killed Mr. Grady but I don't know anything about an accident. I said it was possible that he did it intentionally or nonintentionally when he broke into the residence by him going there to see the man and he picked up a, I said the statement is that he probably picked up a brick and struck Mr. Grady by the head and knocked him out so he wouldn't get hurt or something like that.

Q. Did you ever say to him words to the effect that you knew that he did not mean to do it?

A. Not that I recall.

COURT: Go ahead; the court is not going to pay attention to anything he said.

EXCEPTION NO. 3

Others who assisted Pearson in arresting defendant and transporting him to the sheriff's department were Deputies A. L. Phillips, William C. Goodman, Jr., and J. S. Flowers. Deputy Phillips testified on voir dire that none of the officers asked defendant whether he would waive his rights "if we come back tomorrow." Phillips said "the idea of coming back the next day was the Defendant's idea." Phillips testified further:

Q. Do you recall anyone telling him that if he would go ahead and make a statement, things would go easier for him?

A. No, sir, nobody made that statement.

Defendant testified that after his arrest and during the trip to Kinston:

The Detectives told me that it would be easier for everyone if I cooperated. The Detective told me that things would go lighter and easier for me if I made a statement. When we got to the Detectives' office, he said that it would be easier for everyone if I made a statement, a confession. I told him I didn't want to make a statement; that I wanted a lawyer. Detective Pearson told me that he had went to the hospital where Mr. Grady was and asked Mr. Grady did Tim Chamberlain assault him and he said Mr. Grady shook his head yes.

He said he again reiterated his desire for a lawyer and refused to make a statement after he got to the sheriff's department in Kinston. Defendant said, "I did not invite [Pearson] to come by the next day. I did not request that he come back the next day." Defendant said that the next day, at approximately noon, Detective Pearson and two other deputies took him to an interrogation room and

Pearson said that he had come back; that he was ready for me to make a statement. He did not tell me again that I had

the right to have a lawyer. After Detective Pearson made that statement I didn't say nothing. After he said that, he said it would be easier if I just cooperated and it would be easier for everyone. I was scared. I did make the statement that Detective Pearson referred to. It is not true. I don't know why I made it; maybe confusion and intimidation. I did sign papers for Detective Pearson. I signed these papers on the second day at about twelve o'clock in the conference room. I did not read them before I signed them. After Detective Honeycutt had finished writing the statement, he handed it to me and told me to sign it. After I signed the statement Detective Pearson gave me two more papers and told me to sign them also. Prior to the time I made the statement I had not signed anything. I did not tell Detective Pearson in his office on the night that I was arrested that I wanted him to come back the next day and I would make a statement.

Upon this evidence the court made the following pertinent findings of fact and conclusions of law:

4. That the indictment was issued on March 2, 1981; that the defendant was arrested on March 9, 1981; that he was apprehended in his home in a closet; that he was taken from there in a police car; that he was advised of his *Miranda* Rights in the police car at which time he requested to have an attorney, and advised the officers that he did not wish to talk.

5. That approximately thirty minutes after the advice of his *Miranda* Warning, the defendant was taken to the Lenoir County Sheriff's Department; that he was taken to an interrogation room where the officers told him that they wanted to fill out a written *Miranda* Form and that they got a written Waiver . . .; at that time he informed the officers that he still wanted a lawyer; that he did not wish to talk. Although he refused to sign the *Miranda* Warning at that time, [he] informed the officer that if he would come back the next day, that he would sign the *Miranda* Warning and make a statement.

6. Whereupon the following day the officer went to the Lenoir County Jail and confronted the defendant with three other officers at about twelve noon and [defendant] made a

statement freely, voluntarily and understanding and knowing what he was doing at that time; that he signed a Waiver of his rights which were read to him on that occasion.

7. After signing this Waiver of his rights, he made the statement or made a confession. Before the confession, he signed the first Waiver of his rights which were presented to him the night before.

8. That at the time of the warning given to the defendant on both occasions he stated to the police officers that he understood his rights.

9. That the defendant is 18 years of age; that he quit school in the 8th Grade; that the physical condition of the defendant is good; that his mental condition is good; that he is not confused; that he is coherent; that he understands what is going on.

10. That there were no promises or offers of reward or inducements by law enforcement officers for the defendant to make any statement; that there were no threats or suggested violence or show of violence by law enforcement officers to persuade or induce the defendant to make a statement.

11. That at the time of the second *Miranda* Warning and interrogation on March 10, 1981, the defendant said he did not want an attorney present; that the defendant signed two Waivers of his rights under the *Miranda* Provision; that these were marked as exhibits in this evidentiary hearing.

12. That on March 9, 1981, the defendant, while being interviewed by Detective Pearson in the Detective Office, told Detective Pearson that he, the defendant, wanted an attorney and did not want to make a statement.

That upon the foregoing Findings of Fact, the Court concludes as a matter of law that none of the defendant's constitutional rights, either Federal or the State, were violated by his arrest, detention, interrogation or confession. There were no promises, offers of reward or inducements to the defendant to make a statement; there were no threats or suggested violence or show of violence to persuade or induce the defendant to make a statement; that the statement made by

the defendant to Officer Pearson on March 10, 1981, was made freely, voluntarily and understandingly; that the defendant was in full understanding of his constitutional rights to remain silent, the right to counsel and all other rights and he freely, knowingly, intelligently and voluntarily waived each of those rights and thereupon made the statement to the officers above mentioned.

Defendant excepts to all these findings, but Nos. 4 and 12, on the ground that they are not supported by the evidence. He excepts to the court's failure to find certain facts requested by him on the ground that these are material facts supported by all the evidence adduced at the hearing. Defendant excepts to all conclusions of law on the ground that had the trial court found facts in accordance with all the material evidence at the suppression hearing, it would have been required to conclude that defendant's confession was involuntary.

Following a hearing on a motion to suppress, it is incumbent on the trial court to make findings of fact and conclusions of law. *State v. Jackson,* 292 N.C. 203, 232 S.E. 2d 407, *cert. denied,* 434 U.S. 850 (1977). The court's findings, if supported by competent evidence, are conclusive on appeal. *State v. Herndon,* 292 N.C. 424, 233 S.E. 2d 557 (1977). If there is a conflict between the state's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal. *Id.* If *all* the evidence tends to show that investigators made promises or threats to a suspect whose confession is the product of hope or fear generated by such promises or threats, the confession will be ruled involuntary as a matter of law. *State v. Pruitt,* 286 N.C. 442, 455-58, 212 S.E. 2d 92, 100-02 (1975), and cases there cited.

In the case before us there are material conflicts in the evidence adduced at the suppression hearing. Defendant testified that: (1) he did not tell the officers on the night of his arrest that he would waive his rights and make a statement if they would see him the next day; (2) the interrogating officers told him things would be easier on him if he made a statement; and (3) at the time he made his statement he was "scared," confused, and intimidated by the officers. The state's evidence contradicts defendant's on each of these propositions. This conflict in the evidence was for

the trial court to resolve after hearing the evidence and observing the demeanor of the witnesses. *State v. Fox,* 277 N.C. 1, 24, 175 S.E. 2d 561, 575 (1970). The trial court resolved the conflict in favor of the state; we are bound by that resolution. *State v. Herndon, supra,* 292 N.C. 424, 233 S.E. 2d 557; *State v. Fox, supra.* We conclude that all findings of the trial court are supported by competent evidence.

[2] Defendant argues the court should have found that Pearson told defendant that if he made a statement "it would be easier for everyone." Defendant so testified. Detective Pearson, however, testified consistently on cross-examination that he did not recall making such a statement. It is true that after repeated questioning on cross-examination on this point and repeated assertions that he recalled making no such statement, Pearson did say, "[i]f he [defendant] said that I did make such a statement I don't know how I could deny it because I don't remember saying it." We think, nevertheless, the clear thrust of Detective Pearson's testimony is that he did not make such a statement to the defendant. It would have been preferable for the trial court to have expressly resolved this factual controversy. We are satisfied, however, that the trial court did so by implication at least in its finding number ten "[t]hat there were no promises or offers of reward or inducements by law enforcement officers for the defendant to make any statement."

Defendant argues the trial court should have found that after defendant asserted his rights to counsel and to remain silent on 9 March, Pearson told defendant he would come back the next day to see if defendant had changed his mind. Defendant so testified. Pearson's testimony was to the contrary. Pearson testified that "[a]t that point he stated if I was to bring it [the written waiver of rights form] to him the next day he would sign it, the waiver and he would talk to me." Pearson expressly denied saying anything to defendant to persuade or induce defendant to volunteer to talk with him the following day. Deputy Phillips corroborated Pearson. The trial court, by its finding of fact number five, resolved this factual issue against defendant.

[3] Defendant argues the trial court should have found that Pearson told defendant that the deceased, Grady, had identified defendant as the person who had hit him in the head with a brick,

when in fact Grady had never identified defendant as his assailant. Defendant testified, "Detective Pearson told me that he had went to the hospital where Mr. Grady was and asked Mr. Grady did Tim Chamberlain assault him and he said Mr. Grady shook his head yes." Detective Pearson testified that it was "possible" that he had "told the Defendant that Mr. Grady had identified him as the person that hit him in the head with the brick." Pearson also testified that when he visited Grady in the hospital before his death Grady couldn't speak. Pearson said, "I asked Mr. Grady if Mr. Chamberlain was the person who had hit him. Mr. Grady nodded yes. I then advised Mr. Grady if Timothy Chamberlain had hit him to squeeze my right hand. He did this." We conclude, therefore, that all the evidence tends to show that if Pearson advised defendant that Grady had identified defendant as his assailant, he did so truthfully. Investigators may during interrogation truthfully inform a suspect of the evidence they have against him. Such information, standing alone, does not render a subsequent confession involuntary. *State v. Booker*, 306 N.C. 302, 309-10, 293 S.E. 2d 78, 82-83 (1982). Therefore, a finding by the trial court that Pearson made such a statement would not have necessitated a change in the court's legal conclusions on the motion to suppress.

[4] Defendant argues the trial court should have found that Pearson told defendant that he (Pearson) knew that defendant had killed Grady but that defendant "didn't mean to do it." Defendant so testified. Pearson's testimony is that he did not recall telling defendant the killing "could have been an accident but I could have possibly said that." Pearson said he told defendant that he could have intentionally struck Grady in the head with a brick, intending merely to knock him out, but not intending to kill him. Even if he told defendant the killing could have been accidental, he did not couch this statement in a promise of leniency. Pearson consistently denied telling defendant that a confession would yield him any leniency. Further, Pearson's statement that the killing might have been accidental, according to defendant's own testimony, was made on the evening of 9 March 1981 immediately after defendant was arrested and while he was being transported to the sheriff's department. Defendant then refused to make a statement and asserted his right to a lawyer while he

was in the car and again in the sheriff's office. Defendant did not make his written confession until the following day, around noon.

"A promise of leniency renders a confession involuntary only if the confession is so connected with the inducement as to be the consequence of it." *State v. Pressley,* 266 N.C. 663, 666-67, 147 S.E. 2d 33, 35 (1966) (citing 23 C.J.S., Criminal Law § 825 (1961); 20 Am. Jur., Evidence § 497 (1939) ). But "if promises or threats have been used, it must be made to appear that their influence has been entirely done away with before subsequent confessions can be deemed voluntary, and therefore admissible." *State v. Drake,* 113 N.C. 625, 628, 18 S.E. 166, 167 (1893) (confession made within hours after arresting officer told defendant it might be easier for him if he made an honest confession; separate reason for excluding confession was intervening threat by committing magistrate). Since Pearson's statement about defendant's lack of intent to kill was unaccompanied by any express promise or suggestion of leniency, was made the day before defendant actually confessed, and was followed by defendant's twice asserting his rights to remain silent and to counsel, we conclude the connection between the statement and the confession was so attenuated that the statement itself could not render the confession involuntary. Therefore, even if the trial court had found Pearson's statement to have been made in accordance with what defendant's testimony tended to show, this finding would not have necessitated a change in the court's legal conclusions on the motion to suppress.

[5]  Finally defendant contends the trial court erred in announcing during the voir dire that it was "not going to pay attention to anything he said." This remark was made during the cross-examination of Deputy Pearson after Pearson repeatedly stated that he could not recall making certain statements to defendant. Defendant argues that a judge commits error when he makes a remark concerning the credibility of a witness "in or out of the presence of the jury . . . 'which is calculated to deprive the litigants or their counsel of the right to a full and free submission of their evidence upon the true issues involved to the unrestricted and uninfluenced deliberation of a jury (or court in a proper case).' " *State v. Rhodes,* 290 N.C. 16, 23, 224 S.E. 2d 631, 636 (1976) (quoting Annot., 127 A.L.R. 1385, 1387). Defendant argues that this remark either had reference "to anything the Defendant himself said or anything that was said to the Defend-

State v. Chamberlain

ant by Detective Pearson." In either case defendant says the remark "probably had the effect of stifling the free presentation of competent available testimony during the . . . voir dire and constituted reversible error." Defendant relies largely on *State v. Rhodes, supra.*

*Rhodes* was a prosecution for incest committed by defendant with his stepdaughter, aged twelve. Before trial the stepdaughter's version of several incidences of sexual intercourse with defendant in the presence of her mother were corroborated by an out-of-court written statement signed by the victim's mother, Mrs. Rhodes. At trial the state called Mrs. Rhodes as a hostile witness. At a voir dire hearing to determine her hostility, Mrs. Rhodes testified that she did not remember making or signing the statement, although she did acknowledge the signature on the statement to be hers. She further testified that "none of this is true." She explained that for the past several years she had been treated for mental illness which caused her to have temporary periods of amnesia. The trial court declared her to be a hostile witness and the state proceeded to examine her as such. Before the jury Mrs. Rhodes testified that she had no recollection of signing the statement but acknowledged her signature on the document. On cross-examination she told about her mental illness and again repeated her lack of recollection of making any pretrial statement. At that point the trial court excused the jury and admonished the witness in strong terms to tell the truth. The following colloquy occurred:

A. [by Mrs. Rhodes] Yes, sir. I do remember about taking my medicine at about 1:00 o'clock in the morning.

THE COURT: Yes ma'am, you do. In my estimation you remember the whole thing—whatever you did that day. I just want to let you know that you are treading on very dangerous ground here. And all I'm asking you to do is to tell the truth, Mrs. Rhodes, whatever the truth is.

A. All right, I'll just tell the truth. My husband did not do any of it. He's not that type of man. As far as being a wonderful husband. He's a wonderful husband to me. And to my children he's been a wonderful father. And to that little girl down there (indicating), he's treated her as his. . . .

. . . .

THE COURT: All right. I'm going to allow the State to continue to cross-examine her. I think that the jury will determine what the truth is. I still want you to keep in mind that you are treading upon perjury in your testimony. All I want is the truth. What the Court seeks is the truth. I don't want this man convicted on false testimony. Nor do I want this tragedy to happen.

*State v. Rhodes*, 290 N.C. at 20-21, 224 S.E. 2d at 634. The jury then returned and defendant's counsel stated that he had no further questions for the witness. On appeal this Court awarded defendant a new trial on the ground that the trial court's remarks to Mrs. Rhodes on voir dire, characterized by this Court as "extensive, accusatory, and threatening," resulted in a "record [which] suggests a substantial likelihood that Mrs. Rhodes was not asked [before the jury] whether defendant committed the alleged acts because her attorney felt constrained by the judge's statements. This being true, we feel justice requires that defendant be given a new trial so that all relevant testimony may be adduced and subjected to searching cross-examination." *Id.* at 28, 30, 224 S.E. 2d at 640.

The instant case presents nothing like the situation to which the Court spoke in *Rhodes*. Defendant has failed to demonstrate that the principle relied on in *Rhodes* was violated here. Whether the trial court's remark that it was "not going to pay attention to anything he said" referred to what the defendant might say or what was said to defendant by Pearson, the record fails to suggest that it intimidated, stifled, or constrained defendant in the introduction of his evidence, either on voir dire or before the jury. Defendant testified fully and freely on voir dire regarding his version of the events leading to his confession. At trial he testified fully and freely regarding his version of the events surrounding the crime. Indeed, he makes no contention that the trial court's remarks had any effect on his testimony at trial.

Defendant argues that "the trial court should 'pay attention' to everything said *by* the Defendant and *to* the Defendant during a confession voir dire." We agree. The record, including the remark complained of, simply does not support the argument that the trial court failed to be attentive to all the testimony adduced

at the voir dire hearing, even though he ultimately rejected portions of it. The statement itself is inherently ambiguous; when read contextually it strongly suggests nothing more than the trial court's temporary exasperation with Pearson's inability to recall whether he made certain statements or the continued questioning in light of Pearson's inability to recall. But the court continued to hear testimony from Pearson and other witnesses, including defendant. The court then made reasonably adequate findings and conclusions, including the specific finding that "there were no promises or offers of reward or inducements by law enforcement officers for the defendant to make any statement."

With errors not of constitutional dimension, the burden is on appellant to demonstrate both the error and that the error is reversible, or prejudicial, *i.e.*, that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." G.S. 15A-1443(a) (1978). Although the trial court should not have made this kind of remark, we conclude, because of all the circumstances to which we have referred and the unresolvable ambiguity in the remark itself, defendant has not shown on this record that the remark is indicative of any impropriety on the part of the trial court which might have affected the result either of the voir dire hearing or the trial.

III.

[6]　Defendant next assigns as error the trial court's instructions to the jury that he could be found guilty of second degree murder under a "second degree felony rule" if he killed the deceased while committing common law robbery of the deceased. We agree with defendant that this instruction was erroneous. After careful consideration of the question this Court in a thoroughly researched and documented opinion by Justice Mitchell concluded that "the law of this jurisdiction recognizes no offense of felony murder in the second degree." *State v. Davis*, 305 N.C. 400, 422, 290 S.E. 2d 574, 588 (1982).

Although the court erred in instructing the jury that it could find defendant guilty of second degree murder on a felony murder theory, the error is not reversible because the court also instructed the jury that it could find defendant guilty of second degree murder "on the basis of malice without premeditation and

deliberation" and the jury returned a verdict of guilty of second degree murder both "on the basis of malice without premeditation and deliberation" and "under the second degree felony rule." The evidence at trial supported a second degree murder conviction on the theory of malice and the trial court's instructions on this theory were correct. Since the jury found defendant guilty of second degree murder on this theory, which was properly submitted to it, the error in submitting second degree murder on an erroneous legal theory is not reversible. *See State v. Bryant*, 282 N.C. 92, 191 S.E. 2d 745 (1972), *cert. denied*, 410 U.S. 958 (1973) (case of defendant White), 410 U.S. 987 (1973) (case of defendant Holloman); *State v. Smith*, 201 N.C. 494, 160 S.E. 577 (1931); *cf. State v. Silhan*, 302 N.C. 223, 261-63, 275 S.E. 2d 450, 477-78 (1981) (if two theories submitted in first degree murder case, verdict may be based on either or both); *State v. Goodman*, 298 N.C. 1, 20, 257 S.E. 2d 569, 582 (1979) (jury found defendant guilty of first degree murder using two separate theories; felony murder basis of homicide verdict could be ignored in imposing punishment).

## IV.

[7] Defendant assigns as error the following portion of the trial court's instruction:

> If the State proves beyond a reasonable doubt that the defendant intentionally killed Wilbert Grady with a deadly weapon or intentionally inflicted a wound upon Wilbert Grady with a deadly weapon that proximately caused his death, the law implies first that the killing was unlawful; second, that it was done with malice. If the killing was unlawful and done with malice, the defendant would be guilty of second degree murder.

This assignment of error is overruled on the authority of *State v. Biggs*, 292 N.C. 328, 339-41, 233 S.E. 2d 512, 518-19 (1977), and *State v. Hankerson*, 288 N.C. 632, 649-50, 220 S.E. 2d 575, 588 (1975), *rev'd on other grounds*, 432 U.S. 233 (1977). *See also State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982); *State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981).

## V.

[8] We find no merit in defendant's assignment of error relating to the trial court's refusal to submit voluntary manslaughter as an alternative verdict.

This Court said in *State v. Hampton,* 294 N.C. 242, 250, 239 S.E. 2d 835, 841 (1978):

> Voluntary manslaughter (a lesser included offense of first degree murder) is the unlawful killing of a human being without malice, expressed or implied, and without premeditation or deliberation. *State v. Wynn,* 278 N.C. 513, 180 S.E. 2d 135 (1971); *State v. Street,* 241 N.C. 689, 86 S.E. 2d 277 (1955). One who kills a human being while under the influence of passion or in the heat of blood produced by adequate provocation is guilty of manslaughter. *State v. Wynn, supra; State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305 (1968).

Furthermore,

> [w]here all the evidence tends to show a killing resulting from the intentional use of a deadly weapon, and there is no evidence which will support a finding that the killing was done in the heat of passion on sudden and sufficient provocation or that the defendant used excessive force while fighting in self defense, the law of this State requires the trial judge to instruct the jury that if they are satisfied beyond a reasonable doubt that defendant intentionally inflicted a wound upon the decedent with a deadly weapon which proximately caused his death it would be their duty to return a verdict of guilty of murder in the second degree. *State v. Hankerson,* 288 N.C. 632, 651, 220 S.E. 2d 575, 589 (1975).

*State v. Jones,* 291 N.C. 681, 686, 231 S.E. 2d 252, 255 (1977).

A brick used to strike a victim with such force that it fractures his skull and inflicts brain injury is a deadly weapon as a matter of law. *State v. Perry,* 226 N.C. 530, 39 S.E. 2d 460 (1946); *see also State v. Hobbs,* 216 N.C. 14, 3 S.E. 2d 431 (1939).

Thus all the evidence for the state tended to show that defendant intentionally killed the victim with a deadly weapon. There is no evidence of any killing in the heat of passion or in self-defense. There is no evidence, therefore, which would have supported the submission of voluntary manslaughter as an alternative verdict. *State v. Hampton, supra; State v. Jones, supra.* This assignment of error is overruled.

## VI.

Defendant assigns as error the failure of the trial court to dismiss the cases against him at the close of all the evidence. In his brief defendant candidly concedes that he can find no "valid basis, factual or legal," to support this assignment, but he asks this Court to carefully review the evidence to determine if it is sufficient to support defendant's conviction.

It suffices to say that we have thoroughly reviewed the record and conclude that the evidence is more than sufficient to support the verdict. We deem any further recapitulation of the evidence unnecessary. The assignment of error is overruled.

We conclude that defendant received a fair trial free from prejudicial error.

No error.

Justices COPELAND and MARTIN did not participate in the consideration or decision of this case.