STATE OF NORTH CAROLINA v. ALBERT RHODES

No. 83

(Filed 14 May 1976)

**1. Criminal Law § 99— conduct of trial — discretion of court**
    The presiding judge is given large discretionary power as to the conduct of a trial, and in the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial or which involve the proper administration of justice in the court are within his discretion.

**2. Criminal Law §§ 99, 101— admonition to witness about perjury**
    A trial judge may, if the necessity exists because of some statement or action of a witness, excuse the jurors and, in a judicious

State v. Rhodes

manner, caution the witness to testify truthfully, pointing out to him generally the consequences of perjury.

3. Criminal Law § 99— intimation that witness committed perjury — expression of opinion

Any intimation by the trial judge in the presence of the jury that a witness has committed perjury would be a violation of G.S. 1-180 and constitute reversible error.

4. Criminal Law §§ 99, 101; Constitutional Law §§ 31, 32—admonitions to witness about perjury — invasion of province of jury — right of confrontation — effective assistance of counsel — impartial tribunal

Judicial warnings and admonitions to a witness in a criminal trial create the following special hazards: (1) the trial judge may invade the province of the jury, which is to assess the credibility of the witnesses and determine the facts from the evidence adduced; (2) the judge may, expressly or impliedly, threaten the witness with prosecution for perjury, thereby causing him to change his testimony to fit the judge's interpretation of the facts or to refuse to testify at all, which would constitute a violation of defendant's Sixth Amendment rights to confront a witness for the prosecution for the purpose of cross-examination or to present his own witnesses to establish a defense; (3) the judge may intimidate or discourage defendant's attorney from eliciting essential testimony from a witness and thus violate defendant's constitutional right to effective representation guaranteed by the Sixth Amendment; and (4) the trial judge's manner of warning a witness may violate defendant's due process right to a trial before an impartial tribunal.

5. Criminal Law §§ 99, 101— admonitions to witness about perjury — prejudicial error

When a witness in an incest prosecution—the wife of defendant and mother of the prosecuting witness—testified that she did not recall making any statement to officers implicating defendant in the crime charged or signing such a statement, the trial judge committed reversible error in extensively warning the witness, out of the jury's presence, that he was "not impressed with her truthfulness" and that he was "just not going to tolerate any perjury in this case" since it appears from the record that the remarks were calculated to alter counsel's trial strategy and probably had the effect of stifling the free presentation of competent, available testimony.

APPEAL by defendant under G.S. 7A-30(2) from the decision of the Court of Appeals, reported at 28 N.C. App. 432, 221 S.E. 2d 730 (1975), which affirmed defendant's conviction at the 21 April 1975 Session of the Superior Court of HAYWOOD, *Wood, J.*, presiding.

Defendant appeals his conviction of incest with his stepdaughter, Rose Marie Ledford, a violation of G.S. 14-178.

State v. Rhodes

The State's evidence, except when quoted, is summarized below:

Rose Marie Ledford (Rose), aged 12, testified that prior to 19 January 1974 she lived with her mother and her stepfather—the defendant in this case. During the evenings of 19, 20, and 21 January 1974, between the hours of 9:00 and 10:00 p.m., her mother called her into her stepfather's bedroom where, at his insistence, she engaged in sexual intercourse with him. Her mother was present at the time of each incident. On the morning of 22 January, Rose and her mother related the events of the preceding three nights to their pastor, Mr. Riddley, who took them to the sheriff's office. She was interviewed, in the presence of her mother, by several officers and a social worker, and was later examined by Dr. Weaver. Since that time she has been living in a foster home. Rose indicated that prior to 19 January, relations between her and the rest of her family had not been harmonious and, in her words, "I didn't like my step-daddy too good."

Deputy Charles Messer, Deputy Susie Young, Sheriff Jack Arrington, and social worker Frances Burgin, all testified they interviewed Rose and her mother on 22 January. For purposes of corroboration they testified that Rose told them that defendant had intercourse with her on each of the three preceding nights. Sheriff Arrington said that Mr. and Mrs. Rhodes had had domestic problems and that he knew "Mrs. Rhodes has a mental condition." Mrs. Burgin testified that Rose told her "this had been going on for approximately six months."

During the course of the trial, the State sought to have Mrs. Rhodes, Rose's mother, declared a hostile witness. On a *voir dire* hearing to explore that issue the State produced evidence tending to show that on 22 January 1974 Mrs. Rhodes accompanied Rose to the sheriff's office where she told several officers that her husband had had intercourse with her daughter on the nights in question. She also signed a four-page written statement (State's Exhibit No. 1) which, in graphic terms, purported to detail the events of the three nights about which Rose had testified. Officer Messer testified that he had written the statement as she had given it, "the exact words." Mrs. Rhodes, however, testified that she did not remember making or signing any statement on 22 January. Although she identified her signature on the statement, she said, "but none of this is true."

In explanation she stated that for the past several years, at several institutions, she had been treated for a mental illness which causes temporary periods of amnesia. For five or six years she had been taking medications prescribed by a doctor at Broughton Hospital, one of the State's hospitals for the mentally disordered.

Judge Wood, after stating that Mrs. Rhodes' "statement verifies what the daughter has testified to," declared Mrs. Rhodes a hostile witness, and the State called her as such.

Thereafter, she testified before the jury that she did not remember going to the sheriff's office on 22 January 1974. She was shown State's Exhibit No. 1 and testified that she had no recollection of signing it or of making any statement which implicated her husband in the crime charged. However, she again identified her signature on the document shown her. Mrs. Rhodes insisted that she remembered nothing about being in the sheriff's office until she "came to herself" about 4:00 p.m. She was sitting in the sheriff's office, and the officer told her she could leave.

On cross-examination by defendant's attorney, Mrs. Rhodes testified that she and defendant were married on 25 September 1964; that she had been treated in four mental hospitals—in one, approximately four times. On 22 January, and for the preceding five years, she "was on medication" in order to control her illness. She said she went to the sheriff's office on 22 January 1974 with the Reverend Riddley and Deputy Sheriff Messer, but she has no recollection of having made any statement. She said she had no recollection because she had taken a double dose of medication.

At this point the judge excused the jury and the following transpired:

"THE COURT: The reason that I sent the jury out, I say this to this witness, and that is, I think she's treading on mighty dangerous ground here. Her memory is she remembers the pill she took that morning, and she remembers everything that's convenient for her to remember that's favorable to the position that she's now taking. The Court is just not going to tolerate any perjury in this case. And I thought that I might ought to remind you of that at this point. Now, you have sat here and testified already and I'm sure the jury is aware of this. That you don't remember signing this, but you remember a great deal

of other things. . . . And I'm not impressed with this witness. And I think as a duty in trying to get to the truth that I need to warn her at this time. I'm not impressed with her truthfulness in the statement that was made at the time. But to deny any knowledge of this statement bothers me considerably. I feel compelled to make this to the witness, that her story is not the same now as it was a while ago. She's treading a little further. Her memory is getting better. . . .

"A. (by Mrs. Rhodes) Yes, sir. I do remember about taking my medicine at about 1:00 o'clock in the morning.

"THE COURT: Yes ma'am, you do. In my estimation you remember the whole thing—whatever you did that day. I just want to let you know that you are treading on very dangerous ground here. And all I'm asking you to do is to tell the truth, Mrs. Rhodes, whatever the truth is.

"A. All right. I'll just tell the truth. My husband did not do any of it. He's not that type of man. As far as being a wonderful husband. He's a wonderful husband to me. And to my children he's been a wonderful father. And to that little girl down there (indicating), he's treated her as his. And he supported her when I didn't have no support for her. I had to ask the welfare for support for her.

"MR. FRANCIS: (Defendant's attorney) Your Honor, while the jury is out, will you let me ask her—

"THE COURT: I'll let you ask her anything you want. But I felt compelled to counsel with her that she's getting on dangerous ground. Her memory is too convenient. This thing is a bad thing. The things that she said on that statement. And the things that this little girl has testified to here. I just don't believe that minds are that bad that they can conjure up that sort of thing. And that she could not know at this time that she did not make that statement. I just don't know—maybe I shouldn't be permitted to think, Mr. Francis, but I'm saying what my feelings are out of the presence of the jury.

"MR. FRANCIS: I don't have any further questions, Judge.

"THE COURT: But if the witness signed this statement—she says that she doesn't remember signing any statements for the doctor to examine this little girl. She remembers all about taking pills. She remembers about being brought down here—

and I assume that she's about to remember that the sheriff threatened to indict her. . . .

"A. Mr. Charlie Messer. The officer came down there and told me to get in the car, and I was not advised of my rights. . . . He did threaten me. . . . I was threatened the next morning that I would be indicted.

"THE COURT: All right. I'm going to allow the State to continue to cross-examine her. I think that the jury will determine what the truth is. I still want you to keep in mind that you are treading upon perjury in your testimony. All I want is the truth. What the Court seeks is the truth. I don't want this man convicted on false testimony. Nor do I want this tragedy to happen."

At this point the jury returned and defendant's counsel stated that he had no further questions for the witness. Mrs. Rhodes, in response to the district attorney's questions, again stated that she did not remember making a statement to the officers that defendant had intercourse with her daughter.

Subsequently, Dr. Kenneth Weaver testified for the State that he examined Rose on the morning of 22 January 1974 and he "found nothing unusual to indicate that [she] had had sexual intercourse within the last three days. No evidence at all of it." He said that "assuming the girl were truly virginal three days prior to examination," ordinarily one would expect to find some bleeding. In addition to his physical examination, Dr. Weaver took several specimens which, analysis showed, contained no sperm.

Defendant's evidence consisted of the testimony of several character witnesses, including a former chief of police of Clyde, who attested to his excellent reputation and character.

In addition, Bonnie Mae Wells, a sister of Mrs. Rhodes, testified that on 17 January 1974 she went to care for the Rhodes family while her sister was recovering from a recent illness. She spent each night thereafter in the Rhodes home until she left on 28 January 1974. She was present each of the three nights on which the events allegedly occurred, (19, 20, 21 January 1974) and, according to her, the entire family, including Rose, all watched television together on those nights. Each night she was there she slept with Rose in the back bedroom across the hall from the bedroom in which defendant and

his wife slept. She knows Mrs. Rhodes did not at any time take Rose into defendant's bedroom; that at no time were defendant and Rose together in any bedroom; and that defendant did not have intercourse with Rose.

Mrs. Frances Downs, defendant's mother, testified that she also was in the Rhodes home from 18 January 1974 until defendant took her home around 10:00 p.m. on 20 January. She stated she was there to give defendant his medicine and to attend him on account of injuries he had sustained in a recent explosion in the plant at which he worked. On both the 19th and 20th, the family watched television and nothing unusual occurred. At no time did Mrs. Rhodes ever take Rose into defendant's bedroom. She said that Bonnie Wells was there all the time and that Bonnie slept in the bedroom with Rose.

Defendant's ten-year-old son, James Rhodes, also testified that the entire Rhodes family, his aunt, and his grandmother watched television on the nights in question and his mother never took Rose into his father's room.

Defendant, aged 54, testified that he is a retired Air Force staff sergeant having "completed thirty years of honorable service," which included twenty-three years of active duty. On 15 January 1974 he was injured when a boiler blew up at the Unagusta Manufacturing Company where he had worked for the past five years. Defendant denied having sexual relations with Rose and stated that for some time Rose had been a behavioral problem. According to him, Rose resented the other children and at times would fail to come home from school. On several occasions she took money from his wallet without asking and when he disciplined her, she told him "she would get even with [him] one way or the other." The State asked defendant no questions on cross-examination.

At the close of all the evidence, the judge instructed the jury, who after deliberations, returned a verdict of guilty. From the judgment sentencing him to twelve to fifteen years imprisonment, defendant appealed to the Court of Appeals. That court, in a 2-1 decision, affirmed the conviction and defendant appealed as of right to this Court.

*Attorney General Rufus L. Edmisten and Special Deputy Attorney General James L. Blackburn for the State.*

*Swain, Leake & Stevenson for defendant appellant.*

SHARP, Chief Justice.

Defendant's appeal presents the single question whether the trial judge committed reversible error when, after excusing the jury during defendant's cross-examination of Mrs. Rhodes, he extensively warned her that he was "not impressed with her truthfulness" and that he was "just not going to tolerate any perjury in this case." (The judge's remarks to the witness are set forth in the preliminary statement of facts.)

**[1, 2]** The presiding judge is given large discretionary power as to the conduct of a trial. Generally, in the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial or which involve the proper administration of justice in the court, are within his discretion. *Shute v. Fisher,* 270 N.C. 247, 154 S.E. 2d 75 (1967) ; *Rooks v. Bruce,* 213 N.C. 58, 195 S.E. 2d 26 (1938) ; 88 C.J.S. *Trial* § 36 (1955) ; 7 Strong's N. C. Index 2d *Trial* § 5 (1968). Thus a trial judge may, if the necessity exists because of some statement or action of the witness, excuse the jurors and, *in a judicious manner,* caution the witness to testify truthfully, pointing out to him generally the consequences of perjury. *See* 75 Am. Jur. 2d *Trial* § 115 (1974) ; Annot., *Error—Statements as to Perjury,* 127 A.L.R. 1385, 1388 (1940).

**[3]** Any intimation by the judge in the presence of the jury, however, that a witness had committed perjury would, of course, be a violation of G.S. 1-180 and constitute reversible error. *State v. McBryde,* 270 N.C. 766, 155 S.E. 2d 266 (1967) ; *State v. Simpson,* 233 N.C. 438, 64 S.E. 2d 568 (1951) ; *State v. Swink,* 151 N.C. 726, 66 S.E. 448 (1909). Moreover, whether the reference to perjury be made in or out of the presence of the jury, "error may be found in any remark of the judge, in either a civil or criminal trial, which is calculated to deprive the litigants or their counsel of the right to a full and free submission of their evidence upon the true issues involved to the unrestricted and uninfluenced deliberation of a jury (or court in a proper case)." Annot., 127 A.L.R. 1385, 1387. Therefore, judicial warnings and admonitions to a witness with reference to perjury are not to be issued lightly or impulsively. Unless given discriminatively and in a careful manner they can upset the delicate balance of the scales which a judge must hold evenhandedly. Potential error is inherent in such warnings, and in a criminal case they create special hazards.

[4] First among these is that the judge will invade the province of the jury, which is to assess the credibility of the witnesses and determine the facts from the evidence adduced. *State v. Canipe,* 240 N.C. 60, 81 S.E. 2d 173 (1954) ; 7 Strong's N. C. Index 2d *Trial* § 18 (1968). It is most unlikely that a judge would ever warn a witness of the consequences of perjury unless he had determined in his own mind that the witness had testified falsely. Therefore, if, while acting upon an assumption which only the jury can establish as a fact, he makes declarations which alter the course of the trial, he risks committing prejudicial error. For this reason, *inter alia,* the judge has no duty to caution a witness to testify truthfully. "Once a witness swears to give truthful answers, there is no requirement to 'warn him not to commit perjury or, conversely to direct him to tell the truth.' It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." *United States v. Winter,* 348 F. 2d 204, 210 (2d Cir. 1965).

[4] A second hazard is that the judge's righteous indignation engendered by his "finding of fact" that the witness has testified untruthfully may cause the judge, expressly or impliedly, to threaten the witness with prosecution for perjury, thereby causing him to change his testimony to fit the judge's interpretation of the facts or to refuse to testify at all. Either choice could be an infringement of the defendant's Sixth Amendment rights to confront a witness for the prosecution for the purpose of cross-examination or to present his own witnesses to establish a defense. Both rights are fundamental elements of due process of law, and a violation of either could hamper the free presentation of legitimate testimony. The following statement from Annot., 127 A.L.R. 1385, 1390, is pertinent: "Any statement by a trial court to a witness which is so severe as to put him or other witnesses present in fear of the consequences of testifying freely constitutes reversible error."

The United States Supreme Court considered the foregoing principle in *Webb v. Texas,* 409 U.S. 95, 34 L.Ed. 2d 330, 93 S.Ct. 351 (1972) *(per curiam).* In that case the defendant was convicted of burglary. At his trial, when the State rested its case, the defendant called his sole witness, who was then serving a prison sentence. In the absence of the jury, on his own initiative, the judge admonished the potential witness concerning the consequences of perjury and threatened him with indictment and a prison sentence if he lied on the stand. The

defendant's attorney objected to these comments on the ground that the court was thereby depriving him of his defense by coercing his only witness into refusing to testify. When counsel indicated that he was nonetheless going to ask the witness to take the stand the judge interrupted: "Counsel, you can state the facts, nobody is going to dispute it. Let him decline to testify." The witness then refused to testify for any purpose and was excused by the court.

Upon his conviction the defendant appealed to the Texas Court of Criminal Appeals, contending that the judge had coerced his witness from testifying and that this conduct indicated the trial judge's bias and resulted in a deprivation of due process. That court affirmed the conviction, holding that the petitioner had not adequately objected to the judge's conduct and that, in any event, "there was no showing that the witness had been intimidated by the admonition or had refused to testify because of it."

The Supreme Court, rejecting both of these theories, reversed. The Court said: "The suggestion that the petitioner or his counsel should have interrupted the judge in the middle of his remarks to object is, on this record, not a basis to ground a waiver of the petitioner's rights. The fact that Mills was willing to come to court to testify in the petitioner's behalf, refusing to do so only after the judge's lengthy and intimidating warning, strongly suggests that the judge's comments were the cause of Mills' refusal to testify.

"The trial judge gratuitously singled out this one witness for a lengthy admonition on the damages of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out. Yet in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify.

"In *Washington v. Texas,* 388 U.S. 14, 19 (1967), we stated:

" 'The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.'

"In the circumstances of this case, we conclude that the judge's threatening remarks, directed alone at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Webb v. Texas, supra* at 97-98, 34 L.Ed. 2d at 333, 93 S.Ct. at 353.

[4]   A third hazard is that the judge's admonition to the witness with reference to perjury may intimidate or discourage the defendant's attorney from eliciting essential testimony from the witness. This is particularly true when the judge anticipates a line of defense and indicates his opinion that the testimony necessary to establish it can only be supplied by perjury; *a fortiori,* if the judge's warnings and admonitions to the witness are extended to the attorney, coercion can occur. A law license does not necessarily insulate one from intimidation. In short, even a seasoned trial attorney may trim his sails to meet the prevailing judicial wind. If a defendant's attorney is intimidated by a trial judge's unwarranted or unduly harsh attack on a witness or the attorney himself, then the defendant's constitutional right to effective representation guaranteed by the Sixth Amendment is impinged.

The danger that a defendant's right to effective representation may be impaired by a trial judge's threat to or intimidation of the defendant's counsel has been treated in Annot., *Conduct of Court-Rebuking Counsel,* 62 A.L.R. 2d 166 (1958). In it there appears the following:

"[I]n reviewing a case where the defendant's lawyer has run into stormy judicial weather, courts usually confine their inquiry to the single question: Was the jury influenced, or

likely to be influenced, against the defendant? Once satisfied on this point, most courts promptly decide whether or not to affirm.

"But the jury makes up but a part of the cast of characters in a trial. The lawyer also has his important role; and although the profession, especially that part of it that engages in criminal trials, is often thought to be tough-skinned, it is a fallacy to regard it as deficient in ordinary human sensitivity. If this premise is well taken, it follows that the judge can, by punishment, threat, abuse, and stricture, with or without design, cow or obstruct all but the most daring or determined lawyers to the point that their clients suffer from loss of effective representation. Once such a possibility is recognized, it no longer suffices merely to decide whether or not the jury was biased. Error may have been present although the jury's disposition towards the defendant was not at all warped; it could be that an intimidated or discouraged attorney left undeveloped a persuasive defense, and the trial became ex parte for practical purposes.

"So far as quantity goes, opinions giving direct recognition to the likeness of the judge's hurting the defendant by scaring or disorienting his lawyer are unimpressive; but the handful that have used it are logically attractive." *Id.* at 190.

[4] A fourth and final interest of a criminal defendant that may be affected by a trial judge's manner of warning a witness is the defendant's due process right to trial before an impartial tribunal. "A fair jury in jury cases and an impartial judge in all cases are prime requisites of due process." It is a maxim that " '[e]very litigant, including the state in criminal cases, is entitled to nothing less than the cold neutrality of an impartial judge.' " *Ponder v. Davis,* 233 N.C. 699, 703-04, 65 S.E. 2d 356, 359 (1951). *See State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973) ; *State v. Canipe, supra; In re Estate of Edwards,* 234 N.C. 202, 66 S.E. 2d 675 (1951). The right to an impartial judge embraces a defendant's right to present and conduct his *own* defense unhampered by the judge's idea of what that defense should be or how it should proceed. *See Webb v. Texas, supra.* Compare *Faretta v. California,* . __ U.S. ____, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975). Thus a criminal defendant has the right to present his own version of the facts, to present his own witness without unwarranted judicial interference, and to have his guilt or innocence determined only after all admissible, rele-

vant testimony which he has offered has been considered by the jury. *See United States v. Handy,* 203 F. 2d 407 (3d Cir. 1953) *(per curiam).*

Because of the inherent hazards and many potential errors in the innumerable factual situations in which they may occur, a slide-rule definition of "reversible error" to measure a trial judge's comments to a witness with reference to perjury has not been formulated. As pointed out in Annot., 127 A.L.R. 1385, 1386-87, "The principal questions are, of course, whether acts or reference regarding perjury, by whomsoever made, have the effect either of stifling the free presentation of all the legitimate testimony available, or of preventing the unprejudiced consideration of all the testimony given, either of which may be sufficient to constitute reversible error."

[5]    After applying these considerations to the present case, it is our opinion that the judge's remarks probably had the effect of stifling the free presentation of competent, available testimony. We therefore hold that they constituted reversible error.

Judge Wood's remarks to Mrs. Rhodes, although less severe than the trial judge's admonitions in *Webb v. Texas, supra,* were extensive, accusatory, and threatening. The judge clearly indicated his opinion that the witness was lying when she said she remembered neither making the oral statement to Sheriff Arrington and Deputy Sheriff Messer (about which they both testified) nor signing the written statement (State's Exhibit 1), which Messer testified contained word for word what she had told the officers. The judge was equally positive in his statement that he was "just not going to tolerate any perjury in this case." This last remark was clearly addressed to Mr. Francis, counsel for defendant, as well as to the witness.

Subsequently, in reply to the judge's statement to Mrs. Rhodes that all he was asking her to do was to tell the truth, she said: "All right, I'll just tell the truth. My husband didn't do any of it. He's not that kind of man. . . . " It would appear from this response that Mrs. Rhodes herself had not been intimidated; that, had she been questioned before the jury about events on the nights in question, she would have contradicted the testimony of her daughter, the prosecuting witness.

After Mrs. Rhodes had told the judge the truth was that defendant "didn't do any of it," he specifically told defense

counsel that he'd let him ask her anything he wanted but he was telling him "out of the presence of the jury" what the court's feelings were; that the witness' memory was "too convenient"; that he just didn't believe "minds are that bad that they can conjure up that sort of thing." The clear implication of this judicial pronouncement was that if Mrs. Rhodes, in response to questioning by Mr. Francis, testified before the jury that defendant "did not do any of it," repudiated the statement which bore her signature (State's Exhibit 1), and said she had no recollection of signing it, Mr. Francis would have deliberately offered testimony which the court believed to be perjured.

It was then that Mr. Francis said, "I don't have any further questions, Judge." Shortly thereafter the jury was brought back and Mr. Francis immediately said in their presence, "No further questions, your Honor, for the defendant." However, in response to questions from the district attorney, Mrs. Rhodes then testified, *inter alia,* "I do not remember making a statement in front of Mr. Messer and my daughter, Rose Marie, that my husband, Albert Rhodes, had sexual intercourse with my daughter on January 20, 1974."

Since Mrs. Rhodes did not give the jury her version of the events of the nights of January 19, 20, and 21, 1974, State's Exhibit No. 1 was not competent evidence. However, in the presence of the jury she identified her signature on "the four handwritten pages . . . dated January 22, 1974 . . . State's Exhibit No. 1." Further, Sheriff Arrington and Deputy Sheriffs Messer and Young testified in the presence of the jury that Mrs. Rhodes was present when Rose made the statement charging defendant with incest on the nights in question. The unmistakable inference was that she had made and signed a statement corroborating Rose's testimony. Thereafter she only testified generally as to her mental illness and her treatments for it. The jury were left to speculate why Mrs. Rhodes did not testify further and why the statement, about which there was so much talk, was not offered in evidence.

The Attorney General argues that defendant's trial counsel was fully aware that if Mrs. Rhodes gave testimony exonerating her husband of the crimes charged, her signed statement corroborating her daughter's incriminating testimony would immediately become competent for the purpose of im-

peachment. Therefore, he contends the trial counsel's decision not to offer her exculpatory testimony was not the result of judicial interference or intimidation but represented his considered opinion that her signed statement would do defendant more harm than her testimony could cure.

Obviously counsel faced a difficult decision. State's Exhibit No. 1 did more than corroborate Rose. It added another dimension (purposely omitted here) to conduct which, by all known contemporary standards, is universally condemned. Indeed, the entire statement is so shocking that it brings to mind the old admonition, "I pray you, sir, to understate your case lest the full truth, surprising beyond belief, deafen untutored ears." It is interesting that in his early remarks to counsel during the *voir dire,* the judge himself felt constrained to say with reference to State's Exhibit No. 1, "I'm not impressed with the truthfulness in the statement that was made at the time." At that point he was "bothered" by Mrs. Rhodes' assertion that she had no recollection of making the statement. The testimony of Mrs. Rhodes, one of the three people who knew the truth of the matters in issue, was extremely important to both the State and the defendant. Unfortunately, her history of mental illness and her inconsistent statements made her reliability as a witness for either side suspect.

The credibility of the witness was, of course, for the jury alone. Just as certainly, counsel for defendant was entitled to make the difficult decision whether to offer Mrs. Rhodes' testimony unhampered by pressure from the trial judge. In his brief, represented by different counsel on appeal, defendant asserts that Mr. Francis's "trial tactics" originally called for a thorough examination of Mrs. Rhodes, and these plans were "completely disrupted" by the trial judge's extended comments. On this record we cannot say that counsel's failure to permit her to tell the jury what she had told the judge on *voir dire,* that is, that defendant "didn't do any of it," was the result of trial strategy. On the contrary, the record suggests a substantial likelihood that Mrs. Rhodes was not asked whether defendant committed the alleged acts because her attorney felt constrained by the judge's statements. This being true, we feel justice requires that defendant be given a new trial so that all relevant testimony may be adduced and subjected to searching cross-examination.

As the California District Court of Appeals said in *People v. Byrd,* 88 Cal. App. 2d 188, 189-90, 198 P. 2d 561, 562 (1948) :

" 'Accusations such as were made by defendant's stepdaughter of themselves arouse feelings of animosity and prejudice against the accused, and the testimony of the accuser in such cases frequently is, and in this case it certainly was, of such a nature as to depict the defendant as a depraved individual. . . . "In such a situation, the only defense available, ordinarily, to the accused is his own denial of any asserted misconduct, together with evidence of a former good reputation; otherwise, he is utterly defenseless and at the mercy of a jury which probably is very much prejudiced. . . . It is because of the recognized existence of the ease with which convictions of men, even those of unblemished reputation, may be secured in cases of the instant kind that courts are at pains to insist upon fair trials in all respects being accorded to the accused." . . . . "It has long been recognized that there is no class of prosecution 'attended with so much danger, or which affords so ample an opportunity for the free play of malice or private vengeance.' " . . . ' "

In conclusion, we emphasize that nothing said herein is to be construed as the expression of an opinion as to the credibility of any witness or as to Mrs. Rhodes' veracity at any particular time. These questions must be left to the jury who can observe all the witnesses and weigh their testimony, and whose function it is to find the facts. Because it appears from the record that the judge improperly projected himself into this case in a manner calculated to alter counsel's trial strategy there must be a

New trial.