STATE OF NORTH CAROLINA v. WILLIE B. MELVIN

No. 482A86

(Filed 7 February 1990)

## 1. Constitutional Law § 68 (NCI3d) — right to present witnesses

A defendant's sixth amendment right to present his own witnesses to establish a defense is a fundamental element of due process of law, and is therefore applicable to the states through the due process clause of the fourteenth amendment.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

STATE v. MELVIN

[326 N.C. 173 (1990)]

2. **Constitutional Law § 68 (NCI3d)— judicial or prosecutorial admonitions about perjury—due process—facts of each case**

Neither a judicial warning to a witness about contempt sanctions or perjury prosecutions nor a prosecutorial threat of perjury proceedings constitutes a per se due process violation. Rather, whether judicial or prosecutorial admonitions to defense or prosecution witnesses violate a defendant's right to due process rests ultimately on the facts in each case.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

3. **Constitutional Law § 68 (NCI3d)— admonitions to witness about perjury—due process—appellate review**

In determining whether judicial or prosecutorial admonitions to a witness violate a defendant's right to due process, the reviewing court should examine the circumstances under which a perjury or other similar admonition was made to a witness, the tenor of the warning given, and its likely effect on the witness's intended testimony. If the admonition likely precluded a witness from making a free and voluntary choice whether or not to testify or changed the witness's testimony to coincide with the judge's or prosecutor's view of the facts, defendant's right to due process may have been violated. However, a warning to a witness made judiciously under circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have been perjured does not violate a defendant's right to due process.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

4. **Constitutional Law § 68 (NCI3d)— judicial admonition to respond to State's subpoenas—no violation of right to present witnesses**

Defendant's right to due process was not violated by the trial judge's in-court admonition to two witnesses the day before defendant's trial began that they should comply with subpoenas issued to them by the State or be subject to the court's contempt powers where the admonition was fully justified in light of the witnesses' apparent belief that they did not have to comply with the subpoenas on any day after the day on which the subpoenas were returnable.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

STATE v. MELVIN

[326 N.C. 173 (1990)]

5. **Constitutional Law § 68 (NCI3d) — judicial admonition to family members of witness — no violation of right to present witnesses**

Defendant's right to due process was not violated by the trial judge's admonition to members of the family of a State's witness following his testimony that they would be subject to criminal prosecution if they harassed, intimidated or threatened the witness because of his testimony when the trial judge had been advised of a pattern of familial calls to the witness and his brothers urging them not to testify against defendant solely because of the family relationship between them and defendant.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

6. **Constitutional Law § 68 (NCI3d) — prosecutor's conduct toward witnesses — no violation of right to present witnesses**

Defendant's right to due process was not violated by the prosecutor's out-of-court conduct toward the State's three principal witnesses, which included threats to charge them with perjury if they changed their story and the use of profanity and some physical force, where the prosecutor's conduct was not directed at persons who originally intended to testify on defendant's behalf in that two of the witnesses initially agreed to testify for the prosecution and the third maintained from his earliest contact with the prosecutor that defendant was guilty of the crimes charged; the three witnesses were defendant's cousins, and it was not until defendant and others appealed to their family loyalty that they made statements tending to exculpate defendant and considered testifying for him; and even after these exculpatory statements were made, defendant's counsel never intended to call defendant's cousins as defense witnesses but intended merely to use these statements to cross-examine them when they testified for the State.

**Am Jur 2d, Criminal Law § 848; Trial §§ 43, 88, 113, 115.**

APPEAL by defendant from judgment imposing a sentence of life imprisonment entered at the 7 April 1986 Criminal Session of Superior Court, CUMBERLAND County, *Johnson, J.*, presiding. Heard initially in the Supreme Court on 12 May 1987. Further proceedings in trial court ordered on 28 July 1987. Proceedings certified to Supreme Court on 11 October 1988.

STATE v. MELVIN

[326 N.C. 173 (1990)]

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant appellant.*

EXUM, Chief Justice.

Defendant argues on appeal that three of the principal witnesses against him were so intimidated by actions of the prosecutor and the trial judge that they refused to give testimony favorable to him and, instead, testified against him, thereby depriving him of due process. We find no merit in this argument and no error in the trial.

Upon a two-count bill of indictment defendant was convicted by a jury of armed robbery and conspiracy to commit armed robbery. After returning these verdicts, the same jury considered an indictment charging defendant with being an habitual felon at the time he committed the conspiracy and armed robbery offenses. The jury determined that he was an habitual felon as charged. After a sentencing hearing, at which evidence was introduced that defendant had been previously convicted of a felonious assault, several larcenies, and common law robbery, none of which were used to prove defendant was an habitual felon, Judge Johnson found these prior convictions as an aggravating circumstance and found no mitigating circumstance. Using the sentence enhancing provisions of N.C.G.S. § 14-7.6, and consolidating the armed robbery and conspiracy cases for judgment, Judge Johnson imposed a sentence of life imprisonment pursuant to N.C.G.S. § 14-1.1(a)(3).

Defendant appealed to this Court under former N.C.G.S. § 7A-27(a) before it was amended by Chapter 679, 1987 Session Laws.

The appeal was heard initially in this Court on 12 May 1987. Under the Court's supervisory powers over the trial divisions we remanded the matter to the trial court for further proceedings by order dated 28 July 1987. The further proceedings were certified to the Court on 11 October 1988.

I.

On Tuesday, 8 April 1986, the day before defendant's trial began, Gregory and Anthony Rhone, two of the witnesses who testified against defendant, appeared before the trial judge, who

directed them to comply with the subpoenas issued them by the State and to be present in court at 9:30 the next morning "subject to the contempt powers of the court." The trial judge explained these powers by saying, "That means you go to jail." This admonition was apparently prompted by Gregory and Anthony Rhone's having indicated their intention not to appear pursuant to the subpoenas because, in their opinion, the subpoenas were not effective after Tuesday, 8 April 1986, the date upon which they were returnable.

At trial the State's evidence tended to show that on 1 July 1985 defendant conspired with others to rob Joseph Panzullo. Assisted by others, defendant entered Panzullo's house on that day and with the use of a pistol and a knife rendered Panzullo helpless and robbed him of various items of personal property.

Defendant presented no evidence.

The principal witnesses against defendant were the victim, Joseph Panzullo; James and Anthony Rhone, who were brothers, cousins of defendant, and defendant's accomplices; Owen Harris, who was present with Panzullo at the time of the robbery; and Gregory Rhone, brother to James and Anthony.

Harris testified that he had overheard James Rhone and others conspiring to rob Panzullo. He did not then recognize the others, but according to other testimony, they included Anthony Rhone. Harris went to Panzullo's house to warn him. Both Harris's and Panzullo's testimony tended to establish that James Rhone first entered Panzullo's house, followed by defendant. Defendant threatened Panzullo with a pistol and forced Panzullo and Harris to lie on the floor. Anthony Rhone then entered. Defendant handed James Rhone the pistol, took a knife and threatened to cut Panzullo's head off if Panzullo did not give him money. When Panzullo's assailants were not able to find money they began to remove from the house various items of Panzullo's personal property including a television set, a stereo receiver and cassette player, two other radios and a knife.

The testimony of James, Anthony and Gregory Rhone, all witnesses for the State, tended in most material respects to corroborate that of Panzullo and Harris. James and Anthony admitted they had earlier pleaded guilty to common law robbery of Panzullo, received ten-year suspended sentences and were placed on inten-

STATE v. MELVIN

[326 N.C. 173 (1990)]

sive probation. Their pleas, however, were not entered with any understanding that they would testify against defendant. Gregory Rhone, having left the company of his brothers and defendant some time before Panzullo's robbery occurred, had not been charged with any offense arising out of these events. According to some of the Rhone brothers' testimony, James, Anthony and defendant planned to take drugs from Panzullo. When Panzullo told them he had no drugs, they decided to take his personal property instead.

On cross-examination each of the Rhone brothers admitted that on 4 April 1986, the Friday before defendant's trial was to begin on Monday, he told defense counsel's investigator that defendant had nothing to do with the robbery of Panzullo. Each also admitted that he had signed a statement, which was read to the jury, to the same effect. These witnesses also testified regarding certain pretrial conversations and encounters with Mr. Ammons, the assistant district attorney who was prosecuting defendant; the defendant; and defendant's representatives.

During James Rhone's direct testimony he said that in the last couple of days defendant telephoned him and "told me to be strong and that blood is thicker than water." James said he had also talked to defendant's girlfriend and to other members of defendant's family but that no one had put any pressure on him not to testify.

On cross-examination James Rhone said Mr. Ammons had told him that he might be prosecuted for perjury if he testified untruthfully and that he knew his probation might be revoked if he were convicted of perjury.

On redirect examination James testified that when Mr. Ammons asked him before trial what his testimony was going to be, he told Mr. Ammons it would be essentially as he had testified in court. At the time he entered his guilty plea he told Mr. Ammons that defendant had been involved in the robbery and that he would be willing to so testify. He signed the contrary pretrial statement for defendant's attorney because he did not want to testify against his cousin.

At the conclusion of James's testimony Judge Johnson, out of the jury's presence, asked the members of the Rhone family who were in the courtroom to stand and identify themselves and their relationship to the parties in the case. This colloquy estab-

STATE v. MELVIN

[326 N.C. 173 (1990)]

lished that defendant and the Rhone brothers were second cousins, their grandfathers being brothers. The following colloquy then occurred, also outside the jury's presence:

COURT: All right. Now, this court understands the relationship between the parties and the desire to see certain effects come about on behalf of Willie Bernard Melvin.

MR. WILLIE RHONE [father of Anthony, James and Gregory Rhone]: Yes.

COURT: And I understand the family relationship. However, the reason I brought all of you forward and have asked for your names and addresses and ages to be placed in the record, because I am putting each of you on notice now that should you harass James Rhone in any manner, shape or form as a result of his testimony given in court today on behalf of the State, that I'll cause an investigation to be made by the district attorney's staff to determine whether any one or all of you together have violated any of the criminal statutes dealing with harassment of, communication with or intimidating or interfering with witnesses in the trial of these matters. Now, do each of you understand that?

MR. WILLIE RHONE: Yes.

COURT: Then I take it that each of you can abide by this court's instructions that you're not to intimidate, harass or any way communicate threats to James Rhone as a result of his testimony here today, is that correct?

Each family member present answered affirmatively.

Anthony Rhone testified that his signed pretrial statement favorable to defendant was not true. He signed it to try to help his cousin because their families were close. "Over the last couple days" he told Mr. Ammons and his investigator, Mr. Livingston, that because he did not want to be responsible for sending defendant to prison, he would testify that defendant was not involved in the Panzullo robbery. Anthony expressed particular concern for defendant's seven- or eight-year-old daughter and defendant's girlfriend. Mr. Ammons and Mr. Livingston explained to him the crime of perjury and its penalty.

On cross-examination Anthony Rhone said he had told the defendant's investigator, Mr. Byrd, that in accordance with the

written statement he had signed for Mr. Byrd, he would testify that defendant had nothing to do with the crime. He also said this written statement was not the truth.

Anthony said he had considered taking out a warrant against Mr. Ammons because they had "exchanged a few words" about the case. Mr. Ammons had shouted at him, using profanity, and had pushed him in the hallway of the courthouse. Mr. Ammons' actions upset him and made him angry but did not frighten him. His testimony was not affected by the altercation with Mr. Ammons.

After Anthony Rhone's testimony defendant moved for a mistrial on the ground of prosecutorial misconduct which tended to intimidate the witness. The motion was denied.

Gregory Rhone testified that he overheard his brothers and defendant make plans to rob Panzullo. He wanted no part of the plans and they let him out of the car before the robbery occurred. Gregory said that he had been served with a subpoena by Mr. Livingston and Mr. Ammons. He told them he did not want to testify and that if he was forced to testify he was going to say that defendant had nothing to do with the robbery. At that point Mr. Ammons explained to him the oath, the crime of perjury, and the penalty for perjury. He admitted having been "generally uncooperative" with the prosecutor and engaging in "some shouting matches" with the prosecutor in the prosecutor's office. He admitted having signed a document in which he asserted that defendant had nothing to do with the case.

On cross-examination Gregory admitted that the document he had signed exonerating defendant was not the truth and that he did not want to testify against defendant because "I didn't want to see my cousin get in no trouble." He said Mr. Ammons had told him that if he committed perjury he would be in violation of his probation (apparently imposed after an unrelated conviction) and would go to jail. The following colloquy then occurred:

Q. Well, did he tell you after he went over the statement with you that if you testified to something different that he'd prosecute you for perjury?

A. Yes, sir.

Q. Told you he'd get you ten years for perjury?

A. Yes, sir. True.

On redirect examination by Mr. Ammons, the following collo-
quy occurred:

Q. Mr. Rhone, when I explained what perjury was, I said
I'd do — if you perjured yourself, I'd do everything in my power
to see that you were charged with it?

A. True.

Q. And I also told you if you were charged with it and con-
victed, you could get up to ten years?

A. Right.

At the conclusion of the testimony of Anthony Rhone, defend-
ant moved for a mistrial on the ground that, according to Anthony's
testimony, "there was inappropriate out-of-court conduct on the
part of the prosecutor, at least in an attempt to intimidate the
witness." Defendant also requested the court to instruct the jury
to disregard the testimony of Anthony "because of the credibility
problems and the severe questions of prosecutorial misconduct."
The trial court denied the motion for mistrial upon the grounds
stated but said, "At the close of all the evidence, Mr. Carter,
I'll be glad to receive any instructions in respect to that question
if you desire to make them at that time." At the close of all the
evidence defendant moved to dismiss all charges on the ground
that "the conduct of the prosecutor, as testified to by the witness
Anthony Rhone . . . constitutes an interference with the defendant's
right to due process under the Fourteenth Amendment of the Con-
stitution of the United States." The trial court denied the motion.

On defendant's appeal he assigned error to the denial of his
motion for mistrial and his motion to dismiss. Because the confron-
tations between the prosecutor and the Rhone brothers were not
a part of the trial and no facts regarding them had been found
by the trial court and made a part of the record on appeal, the
Court, in the exercise of its supervisory powers over the trial
divisions, remanded the matter to the Superior Court, Cumberland
County, with instructions to "conduct a hearing in the nature of
hearing on a Motion for Appropriate Relief [and] . . . to make
findings of fact and conclusions of law regarding the prosecutor's
conduct and . . . [to] have the Clerk of Superior Court certify

STATE v. MELVIN

[326 N.C. 173 (1990)]

these findings and conclusions to this Court with reasonable dispatch."[1]

On remand, the trial court, Judge Ellis presiding, heard evidence from Mr. Ammons, James Rhone, Anthony Rhone and others. Judge Ellis found facts as follows:

The Rhone brothers had made out-of-court statements implicating defendant in the robbery. After entry of his guilty plea and without regard to it being part of a plea agreement, James Rhone initially agreed to testify on behalf of the State against defendant Willie Melvin. Likewise, Gregory Rhone initially agreed to testify against defendant. These findings are supported by the evidence. The court also found that Anthony Rhone initially agreed to testify against defendant. The evidence regarding this fact is unclear. However, there is evidence that from the first time Mr. Ammons discussed with Anthony the possibility that he would testify against defendant, Anthony stated that defendant was guilty of the crime charged.

Other findings, all of which are supported by the evidence, are:

The State issued subpoenas for all three Rhone brothers. Defendant did not issue subpoenas for them, and did not intend to call them as witnesses. During the pretrial period, defendant telephoned the Rhone brothers several times and urged James to be strong, telling him, "blood is thicker than water." Family pressures made Anthony reluctant to testify against his cousin. All three began to dodge subpoenas and stated that they would testify differently than they first intended because they did not want to be responsible for defendant's conviction.

Mr. Ammons thought these subpoenas had already been issued when he confronted Anthony and Gregory about their reluctance to testify on Friday, 4 April 1986. He asked why the brothers had changed their minds and warned them about the penalties for perjury. The brothers and Mr. Ammons became engaged in a heated dispute about whether they would testify, and the brothers used profanity with Mr. Ammons. Later, Anthony Rhone more calmly told Mr. Ammons that he did not want to testify against defendant because Melvin was the father of Anthony's niece and

---

1. The Court cited in support of its order *State v. Richardson*, 313 N.C. 505, 329 S.E.2d 404 (1985), and *State v. Sanders*, 319 N.C. 399, 354 S.E.2d 724 (1987).

STATE v. MELVIN

[326 N.C. 173 (1990)]

it would not be fair for defendant to go to jail for the rest of his life, nor was it fair for Anthony to be responsible for such consequences. Anthony also told Mr. Ammons of the family pressure.

All three Rhone brothers then met by the courthouse with Billy Byrd, defense counsel's investigator. Byrd asked if they would sign statements for him about the case. James was not in favor of signing and he told Byrd that defendant was guilty and should not get off scot free. Byrd then told the brothers to step aside and get their stories straight.

Under his brothers' influence, James decided that he did not need to testify against a family member. Each brother then signed separate statements that exculpated defendant, and gave them to Byrd. Defense counsel obtained the statements but did not intend to call the Rhone brothers as witnesses for defendant. Instead he intended to use the statements to impeach the brothers if they testified for the State.

On the night of 4 April, the brothers discussed the matter with their parents who told them to be truthful at trial. James decided to testify for the State, and he told Gregory and Anthony that he did not want them to perjure themselves and get additional punishment.

On Monday, 7 April 1986, Anthony and Gregory came to the courthouse. They had a discussion with Judge Lynn Johnson who told them to go with Mr. Ammons to receive their subpoenas. They left the courtroom with Mr. Ammons, but Anthony and Gregory refused to get on an elevator with Mr. Ammons and several police officers. Anthony started to walk away. Mr. Ammons grabbed him by the arm, used profanity and threatened the brothers with jail if they changed their story. The confrontation continued into the stairwell, with Mr. Ammons and Anthony using curse words in their exchange. Several people witnessed this altercation. Mr. Ammons and the officers subsequently accompanied the brothers to Mr. Ammons' office, and had subpoenas served on Anthony and Gregory. After leaving, the brothers discussed what the nature of their testimony would be.

Based on the foregoing factual determinations and Gregory Rhone's trial testimony,[2] Judge Ellis made these legal conclusions:

---

2. Gregory Rhone did not testify at the post-trial proceedings before Judge Ellis.

defendant had not been deprived of his constitutional right to have his witnesses testify in his behalf; defendant was not entitled to try to discourage the State's witnesses from testifying against him; the prosecutor's strong words spoken under provocation, though unnecessary and unprofessional, did not violate defendant's constitutional right to have his witnesses present because the Rhone brothers were witnesses for the State; and none of defendant's constitutional or statutory rights "were violated by prosecutorial misconduct."

## II.

Defendant contends that his right to present witnesses under the sixth amendment of the United States Constitution as applied to the states through the fourteenth amendment due process clause was violated by the prosecutor's threats to have the Rhone brothers charged with perjury; by the trial court's threats to hold them in contempt if they did not obey their subpoenas; and by the trial court's admonition to the Rhone family members not to harass or intimidate James because of his testimony. We disagree.

[1] A defendant's sixth amendment right to present his own witnesses to establish a defense is a fundamental element of due process of law, and is therefore applicable to the states through the due process clause of the fourteenth amendment. *Washington v. Texas*, 388 U.S. 14, 18 L. Ed. 2d 1019 (1967). In *Webb v. Texas*, 409 U.S. 95, 34 L. Ed. 2d 330 (1972), the Court determined that this right had been violated when the trial court singled out the sole witness whom the defendant called, and engaged in a "lengthy admonition on the dangers of perjury," *id.* at 97, 34 L. Ed. 2d at 333, replete with threats of additional prison time and lost parole chances if the witness lied. Because the judge's extensive lecture "could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify," *id.* at 98, 34 L. Ed. 2d at 333, the Court concluded that his "threatening remarks, directed alone at the single witness for the defense, effectively drove that witness off the stand and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.*

We addressed at length the problem of a trial judge's admonitions to a witness in the context of defendant's cross-examination of a witness for the prosecution in *State v. Rhodes*, 290 N.C. 16, 224 S.E.2d 631 (1976). While recognizing in *Rhodes* that, in the

STATE v. MELVIN

[326 N.C. 173 (1990)]

absence of the jury, a trial judge has some discretionary latitude in cautioning a witness to testify truthfully and in pointing out the possibility of a perjury prosecution, *id.* at 23, 224 S.E.2d at 635-36, we emphasized the potential harm in this practice:

> [T]he judge's righteous indignation engendered by his "finding of fact" that the witness has testified untruthfully may cause the judge, expressly or impliedly, to threaten the witness with prosecution for perjury, thereby causing him to change his testimony to fit the judge's interpretation of the facts or to refuse to testify at all. Either choice could be an infringement on the defendant's Sixth Amendment rights to confront a witness for the prosecution for the purpose of cross-examination or to present his own witnesses to establish a defense.

*Id.* at 24, 224 S.E.2d at 636. Furthermore, a judge's admonition to the witness regarding perjury may discourage defense counsel from eliciting essential testimony from the witness, "particularly . . . when the judge anticipates a line of defense and indicates his opinion that the testimony necessary to establish it can only be supplied by perjury; *a fortiori*, if the judge's warnings and admonitions to the witness are extended to the attorney, coercion can occur." *Id.* at 26, 224 S.E.2d at 637. Applying these principles in *Rhodes*, we determined that even in the absence of the jury, the trial judge's lengthy and critical expressions of opinion about the witness's credibility violated the defendant's due process rights because "the judge improperly projected himself into this case in a manner calculated to alter counsel's trial strategy." *Id.* at 31, 224 S.E.2d at 640.

Relying on *Webb* and *Rhodes*, this Court in *State v. Locklear*, 309 N.C. 428, 306 S.E.2d 774 (1983), reversed the defendant's conviction because the trial judge's repeated admonitions out of the jury's presence to a hesitant, equivocal prosecution witness that she testify truthfully coupled with threats of contempt and perjury proceedings "probably caused the witness to change her testimony." *Id.* at 437, 306 S.E.2d at 779. The defendant was charged with discharging a firearm into a dwelling house. The prosecution witness whose home was fired upon was defendant's former girlfriend. Critical to our reasoning in *Locklear* was that after the last of many warnings by the trial judge, "the witness testified that it was defendant's car outside her house and that defendant was the person she saw outside her house at the time she heard the objects strike her

home. It can be fairly inferred that this testimony resulted from the admonitions of the judge to [the witness]." *Id.* at 437, 306 S.E.2d at 779.

[2] Notwithstanding the results reached in the foregoing precedents, which rest largely upon the facts then before the Court, the cases recognize that a judicial warning to a witness about contempt sanctions or perjury prosecutions is not a *per se* due process violation. As we said in *Rhodes,* "a trial judge may, if the necessity exists because of some statement or action of the witness, excuse the jurors and, *in a judicious manner,* caution the witness to testify truthfully, pointing out to him generally the consequences of perjury." *Rhodes,* 290 N.C. at 23, 224 S.E.2d at 636 (emphasis in the original) (citations omitted). Federal courts have also recognized that judicial perjury warnings do not automatically invoke *Webb*-type due process concerns. In *United States v. Harlin,* 539 F.2d 679 (9th Cir. 1976), the trial court in the absence of the jury said to counsel for appellant's co-defendant: " 'I assume you have advised [your client] of the penalties of perjury . . . and that if it appears that a defendant is lying, the Court can take that into account, too.' " *Id.* at 680. The next day, appellant's counsel told the trial court that the appellant would not testify because of the court's prior admonition to the co-defendant's counsel. *Id.* at 681. The appellant argued on appeal that the trial court's statements to co-defendant's counsel intimidated appellant to the point that he wouldn't testify, thereby denying him due process. *Id.* Determining that the appellant's due process rights were not violated, the Ninth Circuit assumed that *Webb* applied to warnings directed at a co-defendant's counsel and concluded that a mere warning of the consequences of perjury does not constitute a violation of due process. Rather, for a due process violation to lie, the admonition must be threatening and coercive, indicating that the court expects perjury. *Id.*

The *Webb* limitations on judicial behavior have also been applied to prosecutorial conduct. *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976) (prosecutor's repeated warnings to a prospective defense witness about the possibility of a federal perjury charge infringed on the defendant's constitutional right to have the witness testify in his behalf); *United States v. MacCloskey,* 682 F.2d 468 (4th Cir. 1982) (United States Attorney's statement to a prospective witness's attorney that the witness would be "well advised to

remember the Fifth Amendment" destroyed her choice to testify freely).

As with judicial admonitions, the constitutionality of a prosecutor's conduct is determined by the attendant circumstances, and not all prosecutorial threats of perjury proceedings constitute due process violations. In *United States v. Teague*, 737 F.2d 378 (4th Cir. 1984), the United States Attorney phoned a witness's attorney and advised him that if the witness perjured himself, the pretrial diversion agreement would be revoked. Though the court appeared to have misgivings about the prosecutor's conduct, that the witness testified favorably to the defendant and was never directly threatened by any government agent led the court to conclude that the prosecutor's efforts to prevent perjury did not prejudice the defendant so as to require a new trial under *Webb*.

Whether judicial or prosecutorial admonitions to defense or prosecution witnesses violate a defendant's right to due process rests ultimately on the facts in each case. Such admonitions should be administered, if at all, judiciously and cautiously. This is particularly true with regard to prosecutorial conduct because, as here, it generally occurs outside the context of the trial itself, is not a part of the official court proceedings, and is not subject to judicial supervision and control. Witnesses should not be discouraged from testifying freely nor intimidated into altering their testimony. Neither should defense counsel be intimidated or discouraged from eliciting essential and relevant testimony on either direct or cross-examination. *Webb*, 409 U.S. at 98, 34 L. Ed. 2d at 333; *Rhodes*, 290 N.C. at 23-26, 224 S.E.2d at 636. On the other hand, to avoid injustice resulting from perjury, judges may out of the jury's presence judiciously warn a witness against it. *Rhodes*, 290 N.C. at 23, 224 S.E.2d at 636. So may prosecutors when they learn that a potential state's witness is considering changing testimony because of pressure from third parties. *Cf. Teague*, 737 F.2d 378.

[3]  In all these kinds of cases the reviewing court should examine the circumstances under which a perjury or other similar admonition was made to a witness, the tenor of the warning given, and its likely effect on the witness's intended testimony. If the admonition likely precluded a witness "from making a free and voluntary choice whether or not to testify," *Webb*, 409 U.S. at 98, 34 L. Ed. 2d at 333, or changed the witness's testimony to coincide with the judge's or prosecutor's view of the facts, *Rhodes*, 290 N.C. at

STATE v. MELVIN

[326 N.C. 173 (1990)]

24, 224 S.E.2d at 636; *Locklear*, 309 N.C. 428, 306 S.E.2d 774, then a defendant's right to due process may have been violated. On the other hand, a warning to a witness made judiciously under circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have been perjured does not violate a defendant's right to due process. Defendants have no due process or other constitutional right to present perjured testimony. *Nix v. Whiteside*, 475 U.S. 157, 89 L. Ed. 2d 123 (1986). The knowing presentation of such testimony by the State is itself a violation of defendant's right to due process. *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963); *Mooney v. Hollohan*, 294 U.S. 103, 79 L. Ed. 791 (1935).

III.

Applying the foregoing principles to the facts here, we conclude that defendant's right to due process was not violated by the trial judge's in-court admonitions to witnesses Gregory and Anthony Rhone and to the family of the witness James Rhone or by the prosecutor's out-of-court admonitions to the Rhone brothers concerning their intended testimony.

[4] We see nothing whatsoever improper in the trial judge's admonitions complained of on this appeal. When Anthony and Gregory appeared before him before trial, they were admonished simply to respond as the law required to the subpoenas issued to them or else be subject to the court's contempt powers. The admonition was fully justified in light of these witnesses' apparent belief, of which the judge was advised, that they need not comply with the subpoenas on any day after the date upon which the subpoenas were returnable.

[5] The judge's warnings to the Rhone family members following James Rhone's testimony were also justified. The trial judge had been advised of a pattern of familial calls to the Rhone brothers, urging them not to testify against defendant solely because of the family relationship between them and him. It was, therefore, proper for the judge to warn the family members against harassing, intimidating or interfering with James Rhone inasmuch as his testimony was given contrary to their urgings and this kind of conduct on their part would be in violation of law. See N.C.G.S. § 14-226.

Trial judges have broad discretionary authority to do what is reasonably necessary to regulate trials conducted before them

so that proper procedures are followed, the law is not violated, witnesses where necessary are protected, and, in short, "an even keel" is maintained.

> "The presiding judge is given large discretionary power as to the conduct of the trial. Generally, in the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial or which involve the proper administration of justice in the court, are within his discretion."

*Rhodes*, 290 N.C. at 23, 224 S.E.2d at 636. We think the trial judge's admonitions in this case were well within his discretionary authority to control the trial.

Not only were both judicial admonitions appropriate under the circumstances, there is not the slightest indication in the record that either or both of them intimidated any witness for the prosecution into altering testimony or into testifying more favorably for the State than they otherwise would have.

[6] We do not condone Mr. Ammons' out-of-court conduct toward the Rhone brothers, particularly his use of profanity and some physical force, however slight it might have been. We agree with the hearing judge below that such conduct was "unnecessary and unprofessional."

We conclude, nonetheless, that defendant's right to due process was not thereby violated. First, unlike many of the cases we have reviewed, Mr. Ammons' conduct was not directed at persons who originally intended to testify on behalf of the accused. Gregory and James Rhone initially agreed to testify for the prosecution. Anthony Rhone, from his earliest contact with Mr. Ammons, maintained that defendant was guilty of the crimes charged. It was not until others appealed to the Rhone brothers' family loyalty with statements such as "blood is thicker than water" that they made statements tending to exculpate defendant and considered testifying for him. Defendant, however, even after these exculpatory statements were made, never intended to call them as his witnesses. Rather he intended merely to use these statements, as he did use them, to cross-examine the witnesses when they testified for the State. We are not presented with a case where prosecutorial conduct likely precluded a witness, otherwise prepared to testify for a defendant, from doing so.

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

Neither did the prosecutor's conduct result in any of the witnesses testifying more favorably for the State than they other-wise would have. After telling the jury about Mr. Ammons' conduct toward them on cross-examination, the Rhone brothers all consistently maintained their testimony implicating defendant in the crimes charged was true. At the post-trial hearing they reaffirmed this position. Their testimony was consistent with information they had given to Mr. Ammons at early stages of the State's preparation of the case against defendant.

In summary, when we consider the witnesses' original statements to Mr. Ammons implicating defendant, the initial agreements to testify against him, defendant's intention not to call the Rhone brothers as witnesses, family pressures leading the brothers temporarily to change their stories for defendant's benefit, and the parents' advice to the brothers, we conclude, as did the court below, that the prosecutor's conduct toward these witnesses, while inappropriate and unprofessional, did not result in the denial of defendant's right to due process under the sixth and fourteenth amendments. In defendant's trial, therefore, we find

No error.