STATE OF NORTH CAROLINA
v.
JAMES WESLEY STALLINGS.
No. COA08-500
Court of Appeals of North Carolina
Filed May 5, 2009
This case not for publication
Attorney General Roy A. Cooper, III, by Assistant Attorney General John G. Barnwell, for the State.
Sue Genrich Berry, for defendant-appellant.
JACKSON, Judge.
On 11 October 2007, James Wesley Stallings ("defendant") was convicted of first degree murder of Freda[1] Medlin ("Medlin") and sentenced to life imprisonment without parole. Defendant appeals. For the reasons stated below, we hold no error.
At approximately 6:00 a.m. on 31 August 2005, Sonny James ("James") was on his way to work in Nash County, North Carolina. When he turned onto Erkin Smith Road, James was forced to swerve to avoid hitting defendant's grey Nissan pickup truck which was parked in the wrong lane of travel. Defendant was on the driver's side of his truck with the door open, and James observed defendant "kicking something underneath the edge of the truck. I thought he had hit a deer." James recognized defendant because the two previously had hunted together.
Shortly after arriving at work, James returned home with an upset stomach. On his way home, James again traveled along Erkin Smith Road and saw "a body lying face down" in the ditch beside the road. Defendant's truck was gone. James testified that he could see blood in the road and a "body lying on the same side [of the road] the blood [was] on." James then flagged down a truck that had an EMS sticker on the rear glass and returned to the body with the driver of the truck.
The truck James flagged down was driven by Sergeant Larry Danforth ("Sergeant Danforth"), an off-duty Wake Forest Police Department officer. Sergeant Danforth had just passed defendant along Erkin Smith Road when James flagged him down. Upon viewing Medlin's body, Sergeant Danforth initially believed she had been hit by a car due to the injuries he observed. He described her body as "a mangled mess, completely blood soak[ed] . . . ." Sergeant Danforth called 911, and waited with James until law enforcement officers arrived.
David Pike ("Pike") testified that he also traveled along Erkin Smith Road between 6:10 and 6:15 a.m. on 31 August 2005. Pike, like James, swerved to avoid defendant's pickup truck because it was parked in his lane of travel. Pike testified that he "saw a man standing at the back of the truck kicking something underneath the truck. [The man] had something in his right hand and he was motioning for me to go ahead." As he passed the man and his truck, Pike saw blood behind the truck and got "a really uneasy feeling."
At approximately 8:00 a.m. on 31 August 2005, Dr. Harry Daughtery ("Dr. Daughtery"), a pathologist at Nash General Hospital as well as the medical examiner for Nash County, was called to the scene where Medlin's body was found. Dr. Daughtery testified that he observed Medlin's body lying in a ditch beside the northbound lane of Erkin Smith Road. Two pools of blood were near her body as well as bloody footprints leading away into the grass. "[Medlin] had a gapping [sic] wound to her chest," the nature of which indicated that the wound had been inflicted by a shotgun, likely at close range.
Dr. Daughtery also observed bruises and abrasions to or around Medlin's right eye, nose, left cheek, forehead, and chin. The existence of bruises indicated that she had been beaten before she was killed. Dr. Daughtery noticed ligature marks on Medlin's wrists. The marks were "reddish . . . [with] a hint of purple" and located in such a way to suggest that Medlin's wrists had been bound together prior to her death. Dr. Daughtery further observed that Medlin's feet were clean, indicating that she had been brought to the scene where she was found, as opposed to "being shot by a passerby . . . . Her feet should [have] be[en] dirty if she had been walking on the road." Also at the scene, crime scene technicians found a spent shotgun shell near Medlin's body and weed eater string in the grass and bushes near the ditch.
Lieutenant Stephen Saunders ("Lieutenant Saunders") of the Nash County Sheriff's Department learned that defendant had been seen in the area and that a witness reported that defendant was Medlin's boyfriend. Lieutenant Saunders went to defendant's residence to investigate further. Defendant lived in an outbuilding on his grandmother's property; defendant's grandmother lived in the main house.
When Lieutenant Saunders arrived, he observed defendant's truck parked next to the outbuilding on the property. Deputy Todd Wells ("Deputy Wells") arrived soon thereafter. Lieutenant Saunders and Deputy Wells noticed that the driveway around defendant's truck was wet. Lieutenant Saunders and Deputy Wells further observed defendant cutting limbs from a tree on the property, and saw a bottle of cleaning solution, a wheelbarrow, a water hose, cut limbs from a tree, and a fire burning. Lieutenant Saunders and Deputy Wells approached defendant and told him the Nash County Sheriff's Department was investigating Medlin's death. Lieutenant Saunders asked defendant whether he would come to the Sheriff's office to answer some questions; defendant agreed.
Before leaving, Lieutenant Saunders asked Deputy Wells to secure the premises; he also asked Deputy Adam Gelo ("Deputy Gelo") to obtain a search warrant to search the premises for evidence related to Medlin's suspected murder. Deputy Wells then noticed that defendant's truck also was wet with water droplets and saw bits of flesh and blood in the bed of defendant's truck. After defendant left with Lieutenant Saunders, Deputy Wells took photographs of the truck and the fire. The truck had begun to dry, and the fire appeared to have some sort of fabric or cloth burning in it.
Deputy Gelo subsequently obtained a search warrant from a local magistrate. Deputy Wells assisted with the execution of the search warrant. Pursuant to the warrant, authorities collected blood stains from defendant's vehicle and clothes from the washing machine in defendant's grandmother's house. Also pursuant to the warrant, a search of the outbuilding in which defendant resided produced several firearms including a disassembled shotgun hidden inside defendant's couch, shotgun ammunition, and several types of weed eater string.
An autopsy later confirmed Dr. Daughtery's suspicion that the gaping wound in Medlin's chest was caused by a shotgun at close range. Dr. Daughtery explained that
[i]n this case it means close enough that the pellets and wadding were able to enter the body as one unit. That they had not spread out such that there was not a scalp edge to the wound[,] and if you got any further back[,] there would have been multiple wounds where a person's body is peppered.
On 14 November 2005, a true bill of indictment issued against defendant for the first degree murder of Medlin on or about 31 August 2005. On 11 December 2006, defendant filed a motion to suppress his statements and a motion to suppress evidence due to unlawful searches and seizures. On 21 February 2007, the trial court entered orders denying defendant's motions. On 11 October 2007, defendant was convicted of first degree murder for Medlin's murder and sentenced to life imprisonment without parole. Defendant appeals from the 21 February 2007 order denying his motion to suppress the evidence against him.
Preliminarily, we note that defendant has abandoned his assignments of error numbered 3, 4, and 6. See N.C. R. App. P. 28(b)(6) (2007).
Defendant first argues that the trial court's findings of fact numbered 4, 10 through 15, 22, 24, 25, and 27 through 29 are not supported by competent evidence in its order denying defendant's motion to suppress. We disagree.
"Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether it's [sic] findings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion." State v. Allison, 148 N.C. App. 702, 704, 559 S.E.2d 828, 829 (2002) (citing State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)). The trial court's findings of fact are binding on appeal if supported by any competent evidence. State v. Barden, 356 N.C. 316, 332, 572 S.E.2d 108, 120-21 (2002) (citation omitted), cert. denied, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). The trial court's conclusions of law are reviewable de novo. State v. Haislip, 362 N.C. 499, 500, 666 S.E.2d 757, 758 (2008) (citation omitted). When the trial court's findings of fact "are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal." State v. Roberson, 163 N.C. App. 129, 132, 592 S.E.2d 733, 735-36 (citing State v. Baker, 312 N.C. 34, 37, 320 S.E.2d 670, 673 (1984)), disc. rev. denied, 358 N.C. 240, 594 S.E.2d 199 (2004).
Defendant fails to offer argument related to his challenged findings of fact numbered 10, 22, 25, and 27. Accordingly, we deem defendant's assignment of error as to those findings abandoned. See N.C. R. App. P. 28(b)(6) (2007).
In the case sub judice, the trial court made the following challenged findings of fact:
4. Freda Medlin was "the girlfriend" of the Defendant.
. . . .
11. The Defendant's grandmother had lived in the dwelling with her caretaker, Ms. Mary Evans, until she was moved to a nursing home at the end of March 2005.
12. A couple of years prior to this time the Defendant began to store property in the outbuilding behind the dwelling house occupied by his grandmother.
13. He also began to overnight in the outbuilding from time-to-time.
14. As the overnights became more frequent Ms. Evans convinced the Defendant's grandmother to suffer the Defendant to stay in the outbuilding fulltime.
15. From time-to-time the Defendant would enter his grandmother's house to bathe, but otherwise had no connection with the house except to park his vehicle in the backyard of the dwelling.
. . . .
24. Deputy Wells stayed on the scene to prevent contamination of what the deputies believed to be incriminating evidence.
. . . .
28. Everything which Wells observed and photographed was in plain view.
29. The deputies had no knowledge of the ownership circumstances of the premises.
Defendant asserts that finding of fact number 4 is not supported by competent evidence because the deputies only knew that Medlin possibly was defendant's girlfriend. However, the transcript contains the following testimony by Lieutenant Saunders:
Q. All right. What did you do when you got there concerning Mr. Stallings' home?
A. After we had learned that possibly it was his girlfriend who was the deceased 
THE COURT: How did you learn that?
THE WITNESS: Well, we had also learned that a passing motorist had seen Mr. Stallings standing  or parked in the roadway where the body was found, in his vehicle. And I do not recall exactly, Your Honor, how we found out it was his girlfriend, but then we went to his home.
Q. But somebody told you they were boyfriend and girlfriend; is that correct?

A. Yes, sir.

(Emphasis added). Accordingly, we hold the trial court's finding of fact number 4 to be supported by competent evidence.
With respect to findings of fact numbered 11 through 14, defendant does not contest the existence of evidence in support of those findings. Rather, defendant argues that the supporting evidence is not competent because it was adduced during a companion hearing of the same court session in conjunction with defendant's motion to suppress certain of defendant's statements. In support of his position, defendant cites State v. Gurkins, 19 N.C. App. 226, 229, 198 S.E.2d 448, 451 (1973). However, in Gurkins we held that "a motion to quash does not lie unless it appears from an inspection of the face of the warrant or bill of indictment that no crime is charged or that the warrant or indictment is otherwise so defective that it will not support a judgment." Gurkins, 19 N.C. App. at 229-30, 198 S.E.2d at 451. Thus, the cited portion of Gurkins is limited expressly to a rule of law governing a trial court's review of a specific motion  a motion to quash an indictment. Although the remainder of Gurkins pertains to a motion to suppress, the issue addressed and holding established are equally in apposite to the case sub judice. See Gurkins, 19 N.C. App. at 230-31, 198 S.E.2d at 451-52. We further note that the transcript demonstrates that much of the evidence adduced related to both motions, and defendant elected to have the trial court hear his motion to suppress certain of his statements before the trial court heard his motion to suppress physical evidence. Accordingly, defendant's assignment of error as to the trial court's findings of fact numbered 11 through 14 is overruled.
Defendant argues that finding of fact number 15 is not supported by competent evidence because his father testified that defendant sometimes ate, bathed, and washed clothes in the house, but explained that such events were "[n]to on a regular basis." However, Marry Evans, defendant's grandmother's caretaker, testified that defendant lived in the outbuilding, and did not live in the house, but came in to take a shower after he got off of work in the afternoons. We hold the trial court's finding of fact number 15 is supported by competent evidence. "If there is a conflict between the state's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal." State v. Chamberlain, 307 N.C. 130, 143, 297 S.E.2d 540, 548 (1982).
Defendant asserts that the trial court's finding of fact number 24 overstates Deputy Wells' testimony because Deputy Wells remained present to secure the property until a search warrant could be obtained. The trial court found that "Deputy Wells stayed on the scene to prevent contamination of what the deputies believed to be incriminating evidence." Deputy Wells testified that he arrived at defendant's residence, approximately one half of a mile from Medlin's body, to assist with an investigation related to Medlin's death. Deputy Wells further testified that after he had been briefed as to the situation, "Lieutenant Saunders asked me would I stay and secure the perimeter  or the premises, at which time I did." He described his duty to "[n]to let anyone else on the property, so if there was any evidence there, it could not be removed, or nothing else could be brought on the property." We hold that the trial court's finding of fact number 24 is supported by competent evidence. Defendant contends the trial court's finding of fact number 28, finding that "[e]verything which Wells observed and photographed was in plain view," is not supported by competent evidence. Notwithstanding defendant's contention, Deputy Wells' testimony demonstrates that he and Lieutenant Saunders initially approached defendant on the premises to speak with him, and in doing so, Deputy Wells was able to observe a wet spot on the ground, defendant's wet truck, bits of flesh, spots of blood, a fire burning fabric, and a bottle of cleaning solution. Without further intrusion, Deputy Wells photographed the evidence in plain view before it evaporated or burned away. Accordingly, we hold Deputy Wells' testimony provides competent evidence of the trial court's finding of fact number 28.
Defendant contests that finding of fact number 29, which provides that "[t]he deputies had no knowledge of the ownership circumstances of the premises," is not supported by competent evidence because Deputy Wells testified that he was familiar with the address at which defendant resided. We disagree, and we note that familiarity with a physical address  a tangible location freely observable in travel  is different from knowledge of the intangible circumstances of one's property rights. Upon review of the relevant testimony, we are satisfied that the trial court's finding of fact is supported by competent evidence.
Accordingly, we hold the trial court's findings of fact are supported by competent evidence. Defendant's first assignment of error is without merit. Next, defendant broadly assigns error such that the trial court's findings of fact do not support its conclusions of law. Defendant focuses his attack by arguing that (1) evidence gathered by law enforcement officers prior to obtaining a search warrant was gathered in violation of defendant's constitutional protection against unreasonable searches and seizures; and (2) evidence gathered pursuant to the search warrant was inadmissible because the search warrant was not issued upon probable cause. See U.S. Const. amend IV. We disagree.
First, the trial court concluded in relevant part that the "[e]vidence obtained from observations without entry into the pickup truck, out building, or house was not obtained by a search within the meaning of either the State or Federal Constitutions." The trial court made the following relevant findings of fact, all of which we hold to be supported by competent evidence:
6. The witnesses also informed the sheriff's department that the Defendant was known to be connected to a residence approximately one-half mile to the north [of where Medlin's body was found] at 1286 Erkin[] Smith Road.
7. Several deputies, including Saunders and Brake, drove to that residence arriving at 8:08 a.m.
. . . .
16. When the Nash County Sheriff's Deputies arrive[d,]the Defendant was cutting limbs from a tree in the backyard.
17. The Defendant's pickup truck was parked there, appearing to have just been washed.
18. Near the pickup was a large wet spot, which prompted the deputies to conclude the Defendant had just washed the truck.
19. There were other items in view which suggested a cleanup[,] such as a bottle of "409" cleaner, and a fire containing burning fabric.
20. The deputies suspected this was an effort to dispose of evidence that might connect the Defendant to the body which had been found down the road.
21. The Defendant was asked by Deputy Brake if he would come down to the Sheriff[']s Office to answer questions.
22. At no time did the Defendant ask the deputies to leave the premises.
23. The Defendant voluntarily left the scene.
. . . .
26. While awaiting the arrival of the search warrant[,] Deputy Wells observed and photographed items which would constitute evidence against the Defendant.
27. Wells did so without entering the house, the truck, or the outbuilding.
28. Everything which Wells observed and photographed was in plain view.
We previously have instructed that
[t]he Fourth Amendment grants individuals the right to be secure against unreasonable searches and seizures. Generally, a warrant supported by probable cause is required before a search is considered reasonable. The warrant requirement is a principal protection against unreasonable intrusions into private dwellings. This requirement is subject only to a few specifically established and well delineated exceptions.
State v. Phillips, 151 N.C. App. 185, 191, 565 S.E.2d 697, 702 (2002) (internal citations and quotation marks omitted). The plain-view and exigent circumstances exceptions to the warrant requirement of the Fourth Amendment are well-established. See, e.g., Horton v. California, 496 U.S. 128, 133, 110 L. Ed. 2d 112, 121 (1990) (explaining that "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy"); Vale v. Louisiana, 399 U.S. 30, 35, 26 L. Ed. 2d 409, 414 (1970) (recognizing exigent circumstances exception for items of evidence in the process of destruction); Schmerber v. California, 384 U.S. 757, 770, 16 L. Ed. 2d 908, 919-20 (1966) ("The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened `the destruction of evidence[.]'") (quoting Preston v. United States, 376 U.S. 364, 367, 11 L. Ed. 2d 777, 780 (1964)); State v. Guevara, 349 N.C. 243, 250-51, 506 S.E.2d 711, 716-17 (1998) (recognizing exigent circumstances exception for the hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons) (citing Minnesota v. Olson, 495 U.S. 91, 109 L. Ed. 2d 85 (1990)); State v. Mickey, 347 N.C. 508, 516-17, 459 S.E.2d 669, 674-75 (1998) (holding no error for the trial court to admit evidence after investigating officers inadvertently discovered and subsequently seized incriminating evidence in plain view while lawfully on the premises), cert. denied, 525 U.S. 853, 142 L. Ed. 2d 106 (1998); State v. Church, 110 N.C. App. 569, 574-75, 430 S.E.2d 462, 465-66 (1993) (affirming trial court's denial of defendant's motion to suppress incriminating evidence when the evidence seized was in the officers' plain view).
Furthermore, "[l]aw enforcement officers have the right to approach a person's residence to inquire whether the person is willing to answer questions." State v. Wallace, 111 N.C. App. 581, 585, 433 S.E.2d 238, 241, disc. rev. denied, 335 N.C. 242, 439 S.E.2d 161 (1993). "[W]hen officers enter private property for the purpose of a general inquiry or interview, their presence is proper and lawful. . . . `[O]fficers are entitled to go to a door to inquire about a matter; they are not trespassers under these circumstances.'" Church, 110 N.C. App. at 573-74, 430 S.E.2d at 465 (quoting State v. Prevette, 43 N.C. App. 450, 455, 259 S.E.2d 595, 599-600 (1979), disc. rev. denied, 299 N.C. 124, 261 S.E.2d 925, cert. denied, 477 U.S. 906, 64 L. Ed. 2d 855 (1980)).
Here, the deputies were on the premises for the purpose of a general inquiry regarding Medlin's death. Defendant was seen in the back of the property; the deputies approached him to conduct their inquiry; and defendant did not ask the deputies to leave. Therefore, the deputies' presence on the premises was lawful.
In Phillips, police officers responded to a call for help at the defendant's residence. Phillips, 151 N.C. App. at 193, 565 S.E.2d at 703. When the officers entered the house, they observed the victim's body, and they observed blood throughout the house while they conducted a protective sweep of the premises. Id. After securing the scene, a police lab technician and a detective arrived. Id. Prior to obtaining a warrant, the investigators took photographs and videotape of the scene, and they collected blood and physical evidence. Id. We upheld the admission of the evidence and instructed that the detective and lab technician "had every right to enter the area secured by [the police officers] and remove evidence observed in plain view, which had been seized by the securing of the crime scene." Phillips, 151 N.C. App. at 193-94, 565 S.E.2d at 703 (citing Mickey, 347 N.C. at 516, 495 S.E.2d at 674 ("[A] seizure is lawful under the plain view exception when the officer was in a place where he had the right to be when the evidence was discovered . . . .")).
In the case sub judice, while the deputies were lawfully on the premises, they observed indicia of defendant's "effort[s] to dispose of evidence that might connect [him] to the body which had been found down the road." These indicia and items of evidence were in the deputies' plain view, and, given their fleeting nature (e.g., evaporation of the wet spot on the driveway, evaporation of water on defendant's recently washed truck, burning away of fabric, and exhaustion of the fire itself) Deputy Wells' photographed the scene without further intrusion until Deputy Gelo obtained a search warrant. Accordingly, we hold the trial court's conclusion is supported by competent evidence and correct in view of our established precedent. See, e.g., Phillips, 151 N.C. App. at 193-94, 565 S.E.2d at 703.
The trial court further concluded that
[b]ased upon the totality of the circumstances[,] the information supplied the magistrate, including information from citizens, that provided sufficient information from which a neutral judicial official could conclude that probable cause existed to issue a search warrant in this case.
The general rule, pursuant to the Fourth Amendment of the United States Constitution and Article I, section 20 of the North Carolina Constitution, is that issuance of a warrant based upon probable cause is required for a valid search. See State v. Jones, 96 N.C. App. 389, 397, 386 S.E.2d 217, 222 (1989), appeal dismissed and disc. rev. denied, 326 N.C. 366, 389 S.E.2d 809 (1990). An application for a search warrant must contain a statement, supported by allegations of fact, that there is probable cause to believe items subject to seizure may be found on the premises sought to be searched. N.C. Gen. Stat. § 15A-244 (2007). Under the "totality of the circumstances" standard adopted by our Supreme Court for determining the existence of probable cause,
[t]he task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.
State v. Arrington, 311 N.C. 633, 638, 319 S.E.2d 254, 257-58 (1984) (quoting Illinois v. Gates, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548 (1983)). When the application is based upon information provided by an informant, the affidavit should state circumstances supporting the informant's veracity and reliability and the belief that a search will find the items sought. State v.Crawford, 104 N.C. App. 591, 596, 410 S.E.2d 499, 501 (1991). A showing is not required "that such a belief be correct or more likely true than false. A practical, nontechnical probability is all that is required." State v. Zuniga, 312 N.C. 251, 262, 322 S.E.2d 140, 146 (1984) (citation omitted). Further, a magistrate's determination of probable cause should be given great deference, and an "after-the-fact scrutiny should not take the form of a de novo review." Arrington, 311 N.C. at 638, 319 S.E.2d at 258.
We hold that based upon the information supplied in the present affidavit, a magistrate reasonably could conclude that defendant's grandmother's house, the outbuilding in which defendant slept, and defendant's truck probably contained evidence related to Medlin's murder. The affidavit established that (1) the body of a then-unknown white female was found in a ditch in close proximity to defendant's residence; (2) a witness reported seeing defendant sitting in his vehicle close to the victim's body; (3) defendant was identified as Wesley Stallings; and (4) defendant was reported to be the boyfriend of the victim. The affidavit sought a warrant to search the real property, including the house and the outbuilding, at a specified address, as well as defendant's truck. Defendant's assignment of error, therefore, is overruled.
Accordingly, upon review, we hold the trial court's findings of fact support its conclusions of law, and those conclusions are correct.
Finally, defendant argues that the trial court erred by overruling defendant's objections to testimony given by Special Agent Neil Morin ("Agent Morin") of the North Carolina State Bureau of Investigation ("SBI"). Defendant contends that Agent Morin's testimony exceeded his expertise and was speculative. We disagree.
The North Carolina Rules of Evidence provide that
[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.
N.C. Gen. Stat. § 8C-1, Rule 702(a) (2007). "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." N.C. Gen. Stat. § 8C-1, Rule 703 (2007).
A trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion. State v. Bullard, 312 N.C. 129, 144, 322 S.E.2d 370, 378 (1984) (citation omitted). An abuse of discretion occurs where a trial court's ruling is "`manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision.'" State v. White, 349 N.C. 535, 552, 508 S.E.2d 253, 264 (1998) (quoting State v. Syriani, 333 N.C. 350, 379, 428 S.E.2d 118, 133, cert. denied, 510 U.S. 948, 126 L. Ed. 2d 341 (1993)), cert. denied, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). Our Supreme Court has explained that North Carolina courts employ
a three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?
Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (internal citations omitted).
In the case sub judice, defendant argues that (1) Agent Morin's testimony exceeded the scope of his expertise because he offered opinion as to the proximity of the shotgun blast to Medlin's body, and (2) Agent Morin's testimony was speculative because his involvement with the ballistics testing purportedly was limited to re-doing the microscopic examination done by another agent, Agent Trocum.
In relevant part, Agent Morin testified at trial that the shotgun shell recovered near Medlin's body matched the shotgun recovered from defendant's residence and that Medlin likely was shot at close range. Notwithstanding defendant's contentions, we hold the trial court did not err in admitting Agent Morin's expert testimony. The transcript demonstrates that Agent Morin (1) is a special agent with the SBI assigned to the firearm and tool mark section of the State Laboratory in Raleigh, North Carolina; (2) has been an agent in the firearm and tool mark section for more than nine years; (3) has received specialized training related to, inter alia, pellet pattern distance determination, ballistics, microscopy, and toolmarking; (4) has made thousands of comparisons with shotgun shells to particular shotguns; (5) previously has testified as a forensic firearm expert at least sixty-eight times; (6) was received as an expert in firearm forensic identification, pellet placement, patterns, and ballistics; (7) as part of the regular laboratory procedure, acted as a senior examiner in reviewing Agent Trocum's tests and report matching the shotgun shell found near Medlin's body with the shotgun recovered from defendant's residence; (8) conducted independent firing tests and microscopic analysis to confirm that the shotgun shell found near Medlin's body matched defendant's shotgun; (9) explained the various elements that comprise shotgun shells; (10) detailed the dynamics, including distances traveled, of a shotgun shell's elements upon being fired; and (11) opined that Medlin was shot at close range  "contact or near contact"  based upon Agent Morin's prior experience with approximately fifty to sixty cases involving close range shotgun wounds with shotgun wadding found inside a body, photographs of Medlin's wounds introduced at trial, and the testimony of Dr. Daughtery describing the nature of Medlin's wounds . We hold the trial court did not abuse its discretion in allowing Agent Morin's testimony. Accordingly, defendant's assignment of error is overruled.
For the foregoing reasons, we hold no error.
No error.
Judges Robert C. HUNTER and ELMORE concur.
Report per Rule 30(e).
NOTES
[1] Although the transcript sometimes spells Medlin's first name as "Fredia," we adopt "Freda" as denoted in the record.